## Clayman et ux. v. Bernstein

*O'Connell & Tobin,* for plaintiffs.
*Edmonds, Obermayer & Rebmann,* for defendant.

ALESSANDRONI, J., January 27, 1940.—This is a bill in equity to enjoin defendant from developing or making prints of certain films and the negatives thereof and from using the prints in any manner whatever, and further to direct defendant to turn over the undeveloped films or any negatives and prints made therefrom to plaintiffs. These photographs were made by defendant to show the facial disfiguration of plaintiff Annie Clayman as a result of the illness of which she suffered. Defendant is a physi-

cian who treated plaintiff Annie Clayman for coronary thrombosis as a private patient in the Jewish Hospital of Philadelphia from March 20 to July 6, 1938. While she was in a semi-conscious condition in the hospital, defendant, without her permission or that of her husband, plaintiff Barney Clayman, or any member of her family, took the pictures showing the effects of her illness. The bill avers that when plaintiff Annie Clayman was informed of the action of defendant she suffered mental pain and anguish resulting upon her physical well-being and is now distressed and disturbed mentally from the reaction knowing that the photographs are in existence and in possession of defendant, who has refused to deliver them to plaintiff upon her request. Plaintiff Barney Clayman avers that he suffered distress and mental anguish by reason of the reaction both mental and physical upon his wife, and further that it is personally distressing and humiliating to him that the photographs of his wife are in existence and in the possession of defendant.

Preliminary objections were filed on behalf of defendant which have been divided into four parts. In the first place it is argued that the right of privacy cannot be invaded in the absence of publication or other improper use of the photographs. It is contended that actual or intended publication is an essential averment.

The appellate courts of this Commonwealth have not heretofore had occasion to pass upon the existence of the right of privacy, although an interesting discussion of the doctrine may be found in a concurring opinion of Justice Maxey in the case of Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 456. Prior to 1890, decisions both in this country and in England, which related to or involved what we now understand as the right of privacy, were not based upon the existence of that right, but were predicated upon the supposed right of property or a breach of trust or confidence. At that time the doctrine was crystallized and the right of privacy independent of a property or contractual right was recognized in an arti-

cle, The Right to Privacy, by Prof. Samuel D. Warren and Justice Brandeis appearing in 4 Harv. L. R. 193. Since that time the existence of the right has been the subject of conflicting decisions: Roberson, etc., v. The Rochester Folding Box Co. et al., 171 N. Y. 538, 64 N. E. 442; Pavesich v. New England Life Ins. Co. et al., 122 Ga. 190, 50 S. E. 68; Kunz v. Allen et al., etc., 102 Kan. 883, 172 Pac. 532; Edison v. Edison Polyform & Mfg. Co., 73 N. J. Eq. 136, 67 Atl. 392; Douglas v. Stokes, 149 Ky. 506, 149 S. W. 849. This court, in the decision of the case of Harlow et ux. v. Buno Co., Inc., 36 D. & C. 101, recognized the existence of the right of privacy as an independent right derived from the natural law and as a complement of the rights of personal security and personal liberty.

Mr. Justice Maxey, in his concurring opinion in the case of Waring v. WDAS Broadcasting Station, Inc., supra, stated at pages 458-460:

"A man may object to *any* invasion of his right to privacy or to its *unlimited* invasion. . . . When a writer of a letter objects, as he may with legal effectiveness, to any publication of that letter by its recipient, or to its publication *more widely than he authorized,* his purpose is not to protect his property but his privacy. The publication of his letter might not and probably would not cause him one cent's worth of damages, but it might upset his peace of mind and disturb his social relations exactly as would the tapping of his telephone wire or the rifling of his diary or his correspondence. . . . A person who asks a court of equity to prevent his photographs or his artistic renditions from being indiscriminately distributed is likewise seeking the repulsion of intrusions. . . . .

"In every such case the individual is entitled to decide whether that which is his shall be given to the public. No other has the right to publish his productions in any form, without his consent. This right is wholly independent of

the material on which, or the means by which, the thought, sentiment, or emotion is expressed. . . .

"It requires but little argument to show that since a man has a right to withhold from *all dissemination*, his thoughts, sentiments and emotions no matter what their media of expression, he has a right to restrict or limit this dissemination. . . . If a photographer is employed by a patron to take the latter's portrait, the photographer is not justified in making additional copies . . . for himself or in distributing them or publicly exhibiting them by way of advertising or otherwise, without the authority of the customer, either expressed or implied. See *Pollard v. Photographic Co.*, 40 Ch. D. 345."

The court recognized that an individual has the right to decide whether that which is his shall be given to the public and not only to restrict and limit but also to withhold absolutely his talents, property, or other subjects of the right of privacy from all dissemination. The facial characteristics or peculiar caste of one's features, whether normal or distorted, belong to the individual and may not be reproduced without his permission. Even the photographer who is authorized to take a portrait is not justified in making or retaining additional copies for himself.

A man may object to any invasion, as well as to an unlimited invasion. Widespread distribution of a photograph is not essential nor can it be said that publication in its common usage or in its legal meaning is necessary. It may be conceded that the doctrine of privacy in general is still suffering the pains of its birth and any doctrine in its inception borrows from established precedent. An analogy to the laws of libel, however, is not justified under the circumstances of this case. The author of a libel is the creator and there can be no offense until the contents are communicated to another. One cannot invade the rights of another merely by expressing his thoughts on paper. Two persons are necessary. One's right of privacy, however, may be invaded by a single

human agency. Plaintiff's picture was taken without her authority or consent. Her right to decide whether her facial characteristics should be recorded for another's benefit or by reason of another's capriciousness has been violated. The scope of the authorization defines the extent of the acts necessary to constitute a violation. If plaintiff had consented to have her photograph taken only for defendant's private files certainly he would have no right to exhibit it to others without her permission. Can it be said that his rights are equally extensive when even that limited consent has not been given?

Suppose defendant had tapped a telephone wire and listened to a conversation of plaintiff or had obtained possession of her private diary and examined its contents, or in any one of numerous ways had been guilty of eavesdropping. There would be no publication under the definition urged by defendant in his argument, yet in all these acts there is a common characteristic, they were done without authority or consent, and the very act of the wrongdoer without the conveyance of the thought or other property of the victim to another human agent constituted an invasion: Rhodes v. Graham et al., 238 Ky. 225, 37 S. W. (2d) 46.

Furthermore, if the film has been developed by one other than defendant himself, even though the negative has not been printed, the mere development would constitute publication even if the established standards of the laws of libel were adopted. This court will not stultify itself by technicalities to such an extent that it will assume that the photograph has been taken but never will be developed. The taking of the photograph under the circumstances, while plaintiff was in a semi-conscious condition and in the throes of what appeared to be a last illness, and for the purported purpose of establishing a medical record, gives rise to a presumptive intent not only to develop the film but to print the negative and exhibit the print. Does not defendant contend that he not only had the right to take the picture but also to make rea-

sonable use of the prints from time to time for the purposes of medical instruction?

That argument is contained in the second contention of defendant, namely, that a physician is privileged to take photographs of his private patients without their consent as part of his medical record. It is true that the relation of physician and patient like that of attorney and client is confidential and as an incident thereto communications are generally privileged. It may be conceded that, as defendant contends, to an extent there is an implied waiver of the right of privacy, but there can never be a waiver, either expressed or implied, of any right without knowledge and consent and any such waiver is limited thereby.

While the court appreciates the development of the art of photography generally, and in the medical profession particularly, not only as a means of diagnosis and treatment, but also as a means of instruction, its progress has not yet reached a stage at which physicians have been accorded the right to photograph their patients without their consent, nor has medical jurisprudence recognized the unlimited right of a physician to perform any test, administer any treatment, or perform any operation without the authority of the patient. If the picture was a necessary instrument in the treatment of the patient, moreover, it would appear to be a matter that must be averred in an answer to the merits of the bill.

The third contention of defendant is that the right of privacy is purely personal and, therefore, plaintiff Barney Clayman has no cause of action. It may be conceded that this is a personal right and "One has no right of privacy with respect to his relatives, living or dead": 1 Cooley on Torts (4th ed.) 449, sec. 135. Although in its growth this right has been supported by an attendant breach of trust or contract: Routh v. Webster, 10 Beav. 561, 50 Eng. Repr. 698; Dixon v. Holden, L. R. 7 Eq. 488; it would appear to exist independently as a natural right akin to the right of personal security: Pavesich v. New

England Life Ins. Co. et al., supra. It has been seen that the right of privacy is closely akin to the absolute rights recognized at common law of personal security and personal liberty: 1 Lewis' Blackstone's Commentaries, p. 107. In each of these a husband is a proper party in the event of injury to his wife. This might be traced to the identity of husband and wife at common law and the legal fiction that injury to her person constituted injury to the person of the husband. In this case, however, legal fiction is a fact. When a husband and wife are living together an act of this nature necessarily injures the other spouse. The result of invasion, the mental distress, embarrassment and humiliation, clearly indicates that the damage is not visited upon only one.

It would seem, moreover, that the act of defendant directly violated the rights of the husband. He is the person who is liable for his wife's medical treatment and it is with him that the contract of employment of defendant as a physician is made. Such a contract contains many implied provisions upon the breach of which the husband has a right of action. The most common of these perhaps are actions for negligence or malpractice, although they might sound in tort independent of contract. It may very well be, however, that a breach of trust or confidence, so necessarily associated with a contract of this type, may occur. Is not the unauthorized act of taking this photograph such a breach? Would not the nineteenth century court of chancery have rested its decision upon breach of contract rather than recognized privacy as an independent right capable of standing alone?

The final argument of defendant is that equity will not take jurisdiction where property rights are not involved. This contention cannot be seriously considered, although since the dictum in the case of Gee v. Pritchard et al., 2 Swans. 403, 413, 36 Eng. Rep. 670, it has become firmly established as a general rule in the courts of equity. Precedent for jurisdiction is abundant: Pollard v. Photographic Co., L. R. 40 Ch. Div. 345; Waring v. WDAS

550

Broadcasting Station, Inc., supra, concurred in by Justice Maxey. The case of Prince Albert v. Strange et al., 2 De G. & Sm. 652, 64 Eng. Rep. 293, was a bill in equity to restrain publication and to order the destruction of impressions made by one who was entrusted with copper plates for the purpose of making impressions of etchings made by plaintiff. These plates had been taken in violation of a trust and the impressions were made without authority. The injunction was granted.

The unreported case of Manola v. Stevens et al., in the Supreme Court of New York, 1890, which is cited by Professor Warren and Justice Brandeis in their article in 4 Harv. L. R. 195, note 7, is very similar to the one now before this court. The bill averred that plaintiff while engaged as an actress in the Broadway Theatre was surreptitiously photographed by means of a flashlight without her consent by defendant who occupied one of the boxes. The court enjoined defendant in accordance with the prayer of the bill.

Fortunately, the growth of our entire system of jurisprudence is rapidly making the expression damnum absque injuria an obsolete term. Moreover, the history and development of the court of chancery both in England and in this Commonwealth militates against the existence of a wrong without an adequate remedy. Unless equity affords relief under circumstances such as this plaintiffs are in a most lamentable situation. Monetary damages can never be adequate compensation. The very possession of the film and the ever-present possibility of its development and printing, if it has not already occurred, has caused the mental distress and humilation averred. Plaintiffs cannot be compelled to guard against further dissemination by defendant which may be conducted without their knowledge until after the wrong has been completed. The powers of equity are not so impotent that such a situation will be tolerated. The remedy afforded must be such as to destroy the roots of the evil and this can only be done by mandatory injunction.

For the foregoing reasons the preliminary objections must be dismissed.

And now, to wit, January 27, 1940, the preliminary objections are dismissed with leave to defendant to file an answer to the merits within 15 days under the penalty of having a decree taken pro confesso.