William JENKINS, Susann Jenkins, Katheryn Jenkins, Sarah Jenkins, David Jenkins and Faye Jenkins, by Agnes Jenkins, Their Natural Guardian and Agnes Jenkins, Appellants,

v.

**DELL PUBLISHING COMPANY, Incorporated, a New York Corporation.**

No. 12065.

United States Court of Appeals Third Circuit.

Argued Jan. 24, 1957.

Reargued Oct. 22, 1957.

Decided Jan. 13, 1958.

William Claney Smith, Pittsburgh, Pa., for appellants.

Charles C. Arensberg, Pittsburgh, Pa. (Leslie Handler, New York City, Patterson, Crawford, Arensberg & Dunn, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is an appeal from an order granting the defendant summary judgment in a suit for tortious invasion of privacy. The plaintiffs are the widow and children of David Jenkins who had been kicked to death in September, 1953 by the leader of a gang of teen-aged Pittsburgh youths. Defendant is the publisher of the monthly magazine, "Front Page Detective". In the January 1954 issue of this magazine

there appeared on a single page under the title "Heartbreak House" an accurate 150 word account of this homicide naming the persons concerned, including the plaintiffs. The exact text of this publication is set out in the margin.[1] This brief story was illustrated with pictures, among them a group photograph of the plaintiffs identified as the family of the victim.

The gravamen of the claim which plaintiffs have based on this publication is stated in their brief amended complaint as follows:

"4. The defendant is sued for damaging and injuring the plaintiffs by invading the privacy of the plaintiffs by publishing or causing to be published and circulated a picture of the plaintiffs without their permission, and without privilege as hereinafter set forth.

"5. The defendant, Dell Publishing Company, Incorporated, did willfully, wantonly, recklessly, maliciously, and with complete disregard for the interests and rights of the plaintiffs, reproduce, publish and circulate or caused to be reproduced, published and circulated in the state of Pennsylvania, and the United States a picture of the plaintiffs, under the title, 'Heartbreak House', in the January, 1954, edition of 'Front Page Detective' on page 57."

On motion for summary judgment the court considered this complaint and a number of depositions, exhibits, admissions, and answers to interrogatories which established several important facts, in addition to those already stated above. The group photograph of which

plaintiffs complained had been taken by a newspaper photographer shortly after the homicide, with the consent of the plaintiffs and pursuant to their understanding that the picture was to be used for newspaper publicity in connection with the felonious killing of the head of their family. Thereafter, without the knowledge or consent of the plaintiffs, the newspaper which took and published the picture sold a copy of it to World Wide Photos, Inc., which in turn sold it to the defendant, which used it to illustrate the above described story in Front Page Detective some three months after the homicide. An entire copy of this January issue of Front Page Detective was made a part of a deposition which was before the court on the motion for summary judgment.

All concerned have agreed that the allegedly injurious publication occurred in the state of Pennsylvania where the plaintiffs lived and were known and Front Page Detective was circulated. Therefore, the question whether defendant is entitled to summary judgment has properly been viewed as depending upon the law of privacy as it exists and is developing as part of the tort law of Pennsylvania.

As a legally protected interest of personality, privacy is new in the common law. Concepts and rules for the systematic development and protection of this interest are in the making and not fully developed. In Pennsylvania, as recently as 1954, the highest court of the state would not commit itself beyond "[a]ssuming, without deciding, that such a right does exist in Pennsylvania".[2] Nevertheless, we think it adequately es-

---

1. "Frank Stevens, a barber who roomed with the Jenkins family in Pittsburgh, Pa., was attacked by a gang of boys one night on his way home. He broke away from them and told his landlord what had happened. Jenkins didn't like the idea of street corner punks beating someone up and he went out to find them. He spoke to some boys standing under a street lamp at the corner. They denied having beaten Stevens. Then they asked Jenkins for a cigaret. When he refused them, they jumped him. Jenkins fell and they kicked viciously at his head and body. Rushed to a hospital, Jenkins, father of six, was reported dead on arrival—brain hemorrhage. Charged with murder was Ronald Abersold. William B. Hindley was charged with assault. Four other boys are also being held as material witnesses and on assault charges."

2. See Schnabel v. Meredith, 1954, 378 Pa. 609, 107 A.2d 860, 863.

tablished that there is a protected area of privacy under Pennsylvania law,[3] imprecisely defined though it is in the decisions of the Pennsylvania courts.

■ Moreover, we think the evolving law of privacy, in Pennsylvania as in other states, exhibits a basic conceptual framework which makes for and aids in an orderly and systematic development of this new legal field. As we read them, the decisions of judges and the theoretical discussions of scholars about privacy show concern with two types of harm, one of which is more likely to justify judicial intervention than the other. The first and, in terms of the dictionary meaning of privacy, the most obvious matter of legal concern is some measure of protection for the individual against the embarrassment, humiliation or other injury which may result from public disclosure concerning his personality or experiences, truthful and factual though that disclosure may be. But in this situation, the interest of the public in the free dissemination of the truth and unimpeded access to news is so broad, so difficult to define and so dangerous to circumscribe that courts have been reluctant to make such factually accurate public disclosures tortious, except where the lack of any meritorious public interest in the disclosure is very clear and its offensiveness to ordinary sensibilities is equally clear.[4]

■ But there is a second type of situation where a publication is harmful and objectionable, not because of what it discloses about the individual, but because of the way it associates his personality with something else. The unauthorized use of one's story or picture in commercial advertising exemplifies this branch of the law,[5] although there also may be objectionable non-commercial uses of one's likeness or story to promote something else.[6]

■ The present case belongs in the first and not in the second of the above described general categories. The plaintiffs' tragedy was published because the publisher thought that the public would be interested in reading about it, and not to advertise, promote or publicize anything else.

This analysis immediately discloses the fallacy of one of the principal arguments made in support of this appeal. In argument this case has been analogized to those in which a "commercial" use or exploitation of an individual's picture or story has been viewed as a violation of privacy. But we already have pointed out that "commercial" uses are those in which an individual's picture or story has been associated with something else in commercial advertising. Experience has shown that a person of normal sensitivity is likely to find this type of commercialization of his personality very objectionable. At the same time no social interest is jeopardized in curbing such unauthorized advertising practices.

■ Quite different are the cases like this one where a story is recounted solely for the reader interest it may evoke. True, such publication is "commercial" in the sense that Front Page Detective is a magazine published for

3. Mack Appeal, 1956, 386 Pa. 251, 126 A. 2d 679, certiorari denied 352 U.S. 1002, 77 S.Ct. 559, 1 L.Ed.2d 547; Leverton v. Curtis Pub. Co., 3d Cir., 1951, 192 F.2d 974; Hull v. Curtis Pub. Co., 1956, 182 Pa.Super. 86, 125 A.2d 644.

4. E. g. denying liability, Schnabel v. Meredith, supra note 2; Sidis v. F-R Pub. Corp., 2 Cir., 1940, 113 F.2d 806, 138 A.L.R. 15, certiorari denied 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462; Elmhurst v. Pearson, D.C.Cir.1946, 153 F. 2d 467; Estill v. Hearst Pub. Co., 7 Cir., 1951, 186 F.2d 1017; Berg v. Minneapolis Star & Tribune Co., D.C.D.Minn. 1948, 79 F.Supp. 957; imposing liability, Melvin v. Reid, 1931, 112 Cal.App. 285, 297 P. 91; Cason v. Baskin, 1947, 159 Fla. 31, 30 So.2d 635; Barber v. Time, Inc., 1942, 348 Mo. 1199, 159 S.W.2d 291.

5. Pavesich v. New England Life Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101; Continental Optical Co. v. Reed, 1949, 119 Ind.App. 643, 86 N.E.2d 306, 88 N.E.2d 55, 14 A.L.R.2d 743.

6. E. g. Leverton v. Curtis Pub. Co., supra note 3.

profit. But this in no way distinguishes the magazine from almost all other newspapers and magazines. Thus, the commercial character of newspapers and magazines is not a significant circumstance in this or any other case in our first category.[7] The concern of the law that restrictions on public disclosures of the truth be minimal, is not lessened by the fact that the publication of newspapers and magazines is a business rather than a philanthropy.

There is a second and entirely different basis upon which it is urged that the present publication is actionable and not privileged. Indeed, it seems to be the appellants' principal contention that this publication is not entitled to the privileged status of ordinary news items because its actual or intended appeal is to satisfy a public craving for "entertainment" rather than to provide "information". The plaintiffs say they could establish this orientation of the offending story at trial and that this would entitle them to prevail. We do not believe any such distinction is or should be a part of the law of privacy.

For present purposes news need be defined as comprehending no more than relatively current events such as in common experience are likely to be of public interest. In the verbal and graphic publication of news, it is clear that information and entertainment are not mutually exclusive categories. A large part of the matter which appears in newspapers and news magazines today is not published or read for the value or importance of the information it conveys. Some readers are attracted by shocking news. Others are titillated by sex in the news. Still others are entertained by news which has an incongruous or ironic aspect. Much news is in various ways amusing and for that reason of special interest to many people. Few newspapers or news magazines would long survive if they did not publish a substantial amount of news on the basis of entertainment value of one kind or another. This may be a disturbing commentary upon our civilization, but it is nonetheless a realistic picture of society which courts shaping new juristic concepts must take into account.[8] In brief, once the character of an item as news is established, it is neither feasible nor desirable for a court to make a distinction between news for information and news for entertainment in determining the extent to which publication is privileged.[9]

In the case at hand the account published in Front Page Detective and relevantly illustrated with a picture of the plaintiffs was a factual and undistorted short account of a recent homicide. On its face the story revealed that one of the assailants had been charged with murder, another with assault, and that others of the "gang" were being held as material witnesses. Thus the story was one of recent homicide and pending prosecution. It is, of course, normal experience, particularly in a large city, that several months elapse between homicide and any subsequent trial for felonious killing. And current interest continues at least until after the accused is tried. However one may look at it, a story of this kind is a normal current news item. Whether such an illustrated story of recent homicide and pending prosecution has informational value or entertainment

7. For holdings to this effect, construing the New York statute, see Sidis v. F-R Pub. Corp., supra note 4; Gautier v. Pro-Football, Inc., 1951, 278 App.Div. 431, 106 N.Y.S.2d 553. And see the discussion in Feinberg, Recent Developments in the Law of Privacy, 1948, 48 Col.L.Rev. 713, 719–720.

8. "Regretably or not, the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day." See Sidis v. F-R Pub. Co., supra note 4, 113 F.2d at page 809.

9. See Chaplin v. National Broadcasting Co., D.C.S.D.N.Y.1953, 15 F.R.D. 134, 138–9.

452

value or both, it is such a publication of newsworthy occurrence as the privacy cases quite consistently treat as privileged.[10] Any other rule would dangerously and undesirably obstruct the publication of patently newsworthy items by compelling the publisher to speculate as to the value judgments of a judge or a jury with reference to the kind of reader appeal the item offers.

In this case we think that even the appellants would not deny that a January 1954 publication in the Pittsburgh daily papers of the identical story and supporting picture which appeared at that time in Front Page Detective would be a privileged news item. For the purposes of the law of privacy we cannot see how the characters of the item can be affected by the journal in which it appears.

█ In saying this we do not foreclose the novel question which would arise—whether in defamation or privacy we need not speculate—if it were alleged and shown that a magazine in which an individual's story and picture appeared was so notoriously scandalous, disgusting or indecent that any featuring therein of one's name and experience, even in an innocuous or laudatory way, would subject a person of normal sensitivity to embarrassment or humiliation. The mere charge here that the publication was unprivileged is in our view wholly insufficient to put in issue such a special type of wrong as this. Moreover, even if such an allegation appeared, the January 1954 issue of Front Page Detective was before the court. While it is not an intellectual or educational publication and would hardly be characterized as appealing to

"elevated tastes", we find nothing in it which could fairly be characterized as disgusting, or indecent, or appealing to "depraved tastes". A jury should not be permitted to find an otherwise privileged publication to be tortious because it appears in such an environment as this magazine provides.

We conclude, as did the district court, that the pictorially illustrated story of which plaintiffs complain is within the privilege which protects normal news items against claims of tortious invasion of privacy. This conclusion makes it unnecessary to rule upon appellee's separate and additional points that the publication was not offensive to normal sensibilities, and that it was protected by plaintiffs' consent to the taking and original publication of their picture. Of course the judgment below could not be reversed without answering and rejecting all of these arguments.

The judgment will be affirmed.

BIGGS, Chief Judge (dissenting).

The majority opinion takes the position that a newsworthy photograph of an individual may be published, without legal hinderance, in any publication in which it is not associated with "something else in commercial advertising", or, perhaps, in any publication which is not "notoriously scandalous, disgusting, or indecent." The boundary of the first limitation is not clear to me. The second need not be discussed here. If I correctly grasp the scope of the first limitation it is far too narrow. I think that the test is whether the photograph was used for the primary purpose for which the permission to take it was given.[1] The de-

---

10. Cf. Berg v. Minneapolis Star & Tribune Co., D.C.D.Minn.1948, 79 F.Supp. 957; Metter v. Los Angeles Examiner, 1939, 35 Cal.App.2d 304, 95 P.2d 491; Molony v. Boy Comics Publishers, Inc., 1950, 277 App.Div. 166, 98 N.Y.S.2d 119. And see Restatement, Torts, § 867, Comment c.

The courts agree that the privilege of a newsworthy story covers any accompanying photograph reasonably related to it. Abernathy v. Thornton, 1955, 263 Ala. 496, 83 So.2d 235; Metter v. Los

Angeles Examiner, 1939, 35 Cal.App.2d 304, 95 P.2d 491; Bremmer v. Journal-Tribune Pub. Co., 1956, 247 Iowa 817, 76 N.W.2d 762; Sarat Lahiri v. Daily Mirror, Inc., 1937, 162 Misc. 776, 295 N.Y.S. 382.

1. For a reason set out later in this opinion, we are not dealing with a photograph which was taken without permission, such a taking being justified on the theory that the person who was photographed was newsworthy.

cisions in the developing field of the law of privacy in Pennsylvania and in other jurisdictions do not require the adoption of a contrary view. An examination of the issue of *Front Page Detective* in the record and containing the picture complained of shows that a question of fact is presented as to whether its primary purpose is not the dissemination of news but a catering to the palates of those who seek morbidity and sensationalism. This question of fact is one for determination by a jury and therefore I disagree *in limine* with the majority view for the majority ruling deprives the jury of a most important function.

But quite aside from the foregoing, in this case we are concerned with the application of the law of Pennsylvania [2] and the majority opinion fails to give weight to that law.

In Fidelity Union Trust Co. v. Field, 1940, 311 U.S. 169, 177–180, 61 S.Ct. 176, 179, 85 L.Ed. 109, the Supreme Court makes it crystal clear that in a diversity case it is the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State, and that "[I]t is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship." And in West v. American T. & T. Co., 1940, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139, it was said, "State law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' * * *"

There is available data in the decisional law of Pennsylvania which indicates strongly that the Courts of Pennsylvania would protect the plaintiffs' right to privacy under the circumstances at bar. In the Appeal of Mack, 1956, 386 Pa. 251, 259, 126 A.2d 679, 683, the Supreme Court of Pennsylvania made it clear that there is a right to privacy in the law of Pennsylvania and that the Courts of Pennsylvania should protect it. But what is most important here is the fact that the Supreme Court of Pennsylvania in Mack called attention "particularly [to] the concurring opinion of Justice Maxey * * *" in Waring v. WD-AS Broadcasting Service, Inc., 1937, 327 Pa. 433, 194 A. 631, 642. Mr. Justice Maxey stated that not only was there a right to privacy under the law of Pennsylvania but that it might be *limited* by the individual to the extent desired. He wrote: "A man may object to *any* invasion of his right to privacy or to its *unlimited* invasion * * * When a writer of a letter objects, as he may with legal effectiveness, to any publication of that letter by its recipient, or to its publication *more widely than he authorized,* his purpose is not to protect his property but his privacy * * * In every such case the individual is entitled to decide whether that which is his should be given to the public * * * It requires but little argument to show that, since a man has a right to withhold from *all dissemination,* his thoughts, sentiments, and emotions, no matter what their media of expression, he has a right to restrict or limit this dissemination * * * If a photographer is employed by a patron to take the latter's portrait, the photographer is not justified in making additional copies * * * for himself or in distributing them or publicly exhibiting them by way of advertising or otherwise, without the authority of the customer, either express or implied," citing Pollard v. Photographic Company, 40 Ch.D., 345 (1888).

---

**2.** It is unnecessary for the purposes of this dissent to state why I concur in the majority view that the law of Pennsylvania governs the case at bar despite the fact the complaint alleges that the publication occurred "in the State of Pennsylvania, and the United States * * *"

Because of the express and explicit approval by the Supreme Court of Pennsylvania in In the Appeal of Mack of Mr. Justice Maxey's concurring views in Waring v. WDAS Broadcasting Service, Inc., one should conclude the Supreme Court of Pennsylvania would now adopt a similar view, and that under the law of Pennsylvania an invasion of an individual's right to privacy may be limited as that individual designs.

In applying the foregoing to the facts of the case at bar it must be pointed out that this is not a case where individuals were photographed *in a public place* because of their newsworthiness. It is not disputed that the newspaper photographers took the photograph in the plaintiffs' home and that they could not have done so without the plaintiffs' permission. There could have been no photograph without that authorization. On the instant record, a jury would be entitled to find that the two photographers represented that they were from the Pittsburgh newspapers which would publish the photographs[3] and that the plaintiffs authorized only such a limited invasion of their right to privacy.[4] In my view the majority opinion errs in depriving a jury of this vital function. I am of the opinion that the plaintiffs would be entitled to a verdict in their favor since the limited authorization which they gave was grossly exceeded.

The result reached by the majority finds no sound basis in policy. Under the ruling the right to privacy in Pennsylvania vanishes visibly and, I fear, may do so elsewhere. Once an individual consents to have his picture taken for publication in connection with an event reported in a local newspaper and that photograph goes into the world-wide machinery maintained by the Associated Press and World Wide Photos, Inc., any subsequent publication of the photograph, whatever its purpose, if it be not connected with "something else in commercial advertising" or is not in a magazine "notoriously scandalous, disgusting, or indecent," may appear without legal hinderance anywhere and at almost any time. The nature of the subsequent publication or publications, subject only to the mild and rather vague *caveats* of the majority opinion, becomes immaterial. The fact that the subsequent publication or publications may be for the primary purpose of selling a magazine devoted to sensationalism or to the whetting of morbidity, is deemed to be irrelevant under the majority view.

For the reasons stated I must respectfully dissent.

I am authorized to state that Judge McLAUGHLIN and Judge STALEY concur in this dissent.

3. The publication of the photograph in Front Page Detective was far more widespread. It appears from depositions, from answers to interrogatories, and from the masthead of the magazine itself that Dell caused Front Page Detective to be published in New Jersey and distributed by its printer in that State to all the States of the United States, including Pennsylvania, and to the Dominion of Canada. The total circulation of the January issue was 498,572 copies, of which 19,440 were circulated in Pennsylvania, and 3,075 in Allegheny County.

4. In his deposition of September 29, 1955 William Jenkins, one of the plaintiffs, stated when he was questioned by defendant's counsel:
"Q. You had no objection to having your picture taken, did you? A. Not for the newspapers, but no detective books. We didn't want our pictures in no detective books.
"Q. Did you say so at the time? A. Nobody told us there was anybody there from a detective publishing company."