Aquino *v.* Bulletin Company, Appellant.

530

Argued September 17, 1958; reargued March 17, 1959. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Robert F. Irwin, Jr.*, with him *Henry M. Irwin*, and *Irwin and Kevlin*, for appellant.

*Stephen M. Feldman*, with him *Joseph G. Feldman*, and *Feldman & Feldman*, for appellees.

OPINION BY WOODSIDE, J., September 16, 1959:

This appeal involves the right of privacy. Michael Aquino, his wife, Nancy, and his daughter, Theresa Allizzo, brought an action in trespass against The Bulletin Company claiming an unwarranted invasion of their right of privacy by an article published December 3, 1950 in The American Weekly, a supplement to The Sunday Bulletin, a Philadelphia newspaper. The jury found for the defendant in the case of Theresa Allizzo, and for the plaintiffs, Michael and Nancy Aquino, in the sum of $5000 each in their cases. The

defendant moved for judgment n.o.v. and for a new trial. The motions having been overruled, and judgment having been entered on the verdicts, the defendant appealed to this Court.

The capacity for growth which characterizes the common law has enabled the courts to afford protection against the unwarranted invasion of the right of privacy without the interposition of the legislature, even though legal action for that right was unknown to the early common law. *Hull v. Curtis Publishing Co.*, 182 Pa. Superior Ct. 86, 125 A. 2d 644 (1956); Warren & Brandeis, 4 Harvard Law Review 193 (December 15, 1890).

The unwarranted invasion of the right of privacy is actionable in Pennsylvania: *Hull v. Curtis Publishing Co.*, supra; *Waring v. WDAS Broadcasting Station Inc.*, 327 Pa. 433, 194 A. 631 (1937); *Schnabel v. Meredith*, 378 Pa. 609, 107 A. 2d 860 (1954); *Mack Appeal*, 386 Pa. 251, 126 A. 2d 679 (1956); *Bennett v. Norban*, 396 Pa. 94, 151 A. 2d 476 (1959); *Leverton v. Curtis Publishing Co.*, 192 F. 2d 974 (1951); *Jenkins v. Dell Publishing Co.*, 251 F. 2d 447 (1958); *Harlow v. Buno Co. Inc.*, 36 Pa. D. & C. 101 (1939); *Clayman v. Bernstein*, 38 Pa. D. & C. 543 (1940); *Lisowski v. Jaskiewicz*, 76 Pa. D. & C. 79 (1951); *Christie v. Greenleaf*, 78 Pa. D. & C. 191 (1951).

In Pennsylvania we have only begun to draw the lines bounding the right. As the courts are pioneering in this field, it is important to examine carefully the principles and to apply them in a manner that will further and not hinder the cause of human freedom. Without well defined limitations the right of privacy might dangerously encroach upon freedom of speech and freedom of the press. Legal actions for invasion of the right of privacy must not be a vehicle for the establishment of a judicial censorship of the press. The courts

are not concerned with establishing canons of good taste for the press or the public. See *Leverton v. Curtis Publishing Co.*, supra, 77 C.J.S. Right of Privacy §4a.

Although not clearly defined, the right of privacy has been referred to as "the right to live one's life in seclusion, without being subject to unwarranted and undesired publicity . . . the right to be let alone." *Hull v. Curtis Publishing Co.*, 182 Pa. Superior Ct. 86, 90, 125 A. 2d 644 (1956); *Kerby v. Hal Roach Studios, Inc.*, 53 Cal. App. 2d 207, 127 P. 2d 577, 579 (1942). It has also been defined as the right of a person to be free from unwarranted publicity or unwarranted approbation or exploitation of one's personality; the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion of one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. *Smith v. Doss*, 251 Ala. 250, 37 So. 2d 118, 120, 121 (1948); *Banks v. Kings Features Syndicate*, 30 F. Supp. 352 (1939).

One of the best, and probably the most thoroughly considered, explanation of the principle can be found in the discussion of the rule in the Restatement of the Law of Torts, Vol. 4, §867. The rule is there stated as follows: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other."

In the Restatement it is said that the rule is relative to the customs of the time and place, and to the habits and occupation of the plaintiff. One who is not a recluse must expect comment upon his conduct. Likewise, if he submits himself or his work for public approval, as does a candidate for public office, a public official, an actor, an author, or a stunt aviator, he must necessarily pay the price of even unwelcome publicity

through reports upon his private life and photographic reproductions of himself and his family, unless these are defamatory or exceed the bounds of fair comment. One who unwillingly comes into the public eye as in the case of a criminal,[1] and even one unjustly charged with crime or the subject of a striking catastrophe, is subject to the limitations on his right to be let alone. Both groups of persons are the objects of legitimate public interest during a period of time after their conduct or misfortune has brought them to the public attention. Publishers are privileged "to satisfy the curiosity of the public as to their leaders, heroes, villains and victims."

The rule does not depend for its validity upon a breach of confidence, nor upon the untruth of the statements. The liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities. It is only where the intrusion has gone beyond the limits of decency that liability accrues. These limits are exceeded where intimate details of the life of one who has never manifested a desire to have publicity are exposed to the public. On the other hand, there is no invasion of a right of privacy in the description of the ordinary goings and comings of a person, or of weddings, even though intended to be entirely private, or of other publications to which people do not ordinarily seriously object. The fact that the plaintiff suf-

---

[1] In the *Mack Appeal*, supra, 386 Pa. 251, 126 A. 2d 679 (1956), which was *not* an action for the unwarranted invasion of the right of privacy, there is dicta suggesting that it is an unwarranted invasion of the right of a prisoner's privacy for a newspaper to take and publish his picture. This is contrary to discussions of the right contained in the Restatement and in court opinions, the digests and numerous law review articles. Nearly all newspapers almost daily publish pictures not only of convicted criminals, but of people charged with crime.

fered neither pecuniary loss nor physical harm is unimportant. The damages whether nominal, compensatory or punitive can be awarded in the same way in which general damages are given for defamation. Restatement of the Law of Torts Vol. 4, §867.

With these explanations of the right in mind let us examine the facts of this case which, as is usual in cases of unwarranted invasion of the right of privacy, are not in serious dispute.

The plaintiff, Theresa, daughter of the appellees, secretly married John N. Masciocchi on August 19, 1949, before a Justice of the Peace. John promised to provide a home for her later and to marry her in a church. They each returned to their parents' homes after the ceremony, and the marriage was never consummated. Theresa's parents learned about the marriage the next day. Later when Theresa pressed her husband to carry out his promises, he told her that he did not intend to keep them, and that he married her only to spite her parents who had been opposed to his courting her. The appellees upon hearing about this employed an attorney who filed an action in divorce for Theresa against her husband. As is customary, the Philadelphia newspapers carried a report of the filing of the divorce action. The defendant did not contest the divorce but after testimony was taken by the master a legal question relating to annulment and fraud arose upon which President Judge SMITH of the Court of Common Pleas No. 5 in Philadelphia wrote an opinion dated June 29, 1950, and published in the advance sheets of the District and County Reports about November 17, 1950 (72 Pa. D. & C. 257). The newspapers also reported the granting of the decree. Even with all this publicity, Theresa and her parents succeeded in keeping her marriage and divorce secret from their friends and relatives.

In Philadelphia, the institution of divorce actions, the granting of divorce decrees, and, of course, the courts' opinions are public records, but the masters' reports and the other divorce records are not open to public inspection.

Theresa's marriage and her divorce were newsworthy events. Newspapers had a right to publish such information. They also had a right to quote from or republish the opinion filed by the court. Publishing these events which were included in public records does not constitute an unwarranted invasion of the right of privacy of the parties involved, or as a general rule, of other persons named in the records, providing the facts have not ceased to be newsworthy through lapse of time. *Smith v. Doss,* 37 S. 2d 118 (Ala. 1948); *Metter v. Los Angeles Examiner,* 95 P. 2d 491 (Cal. 1939). As the article was published only 18 days after the court opinion, the news was current.

This case was provoked by the article telling about Theresa's marriage and divorce which was published in The Sunday Bulletin of which 695,423 copies were distributed. The reporting of *these facts alone* would not have been an unwarranted invasion of *Theresa's* right of privacy, but the jury having found against her, and no appeal having been taken from the trial court's overruling of her motion for a new trial, the question of her action is not now before us.

Her parents, the appellees here, argue that their names were not mentioned in the public court records, and as a result The Bulletin Company had no right to refer to them by name in its story about their daughter's marriage and divorce.

The opinion in the divorce case did refer to "Theresa's parents", but did not mention their names and address. To prevent the press from filling in this detail when reporting a public record would constitute

an unwarranted interference with the right of the press to disseminate the news. It would be an interference with freedom of the press. The use of the parents' names and address in reporting the court opinion and the facts contained in it was not an unwarranted invasion of the parents' right of privacy. The parents were not public figures, and do not come within the class of those people who submit themselves or their work for public approval, but they do come within the class of those who through a court action became, however unwillingly, objects of public interest, and during a reasonable period of time after their misfortune has brought them into a newsworthy event the newspapers are privileged to report that event and their connection with it.

The facts contained in the Bulletin article were substantially correct and most of them could have been published as a newsworthy event without constituting an unwarranted invasion of the right of privacy of either Theresa or her parents. There is no unwarranted invasion of a right of privacy in the description of a wedding even though it is intended to be entirely private. Restatement of the Law of Torts §867 (d). Neither can there be an unwarranted invasion of the right of privacy by reporting, within a reasonable time, the issuance of a marriage license, the official recording of the marriage, the filing of a divorce action, or the granting of a divorce decree, regardless of how anxious the parties involved may be to keep the information from the public. These are newsworthy events of public or general interest which the press is privileged to report as news. See Warren & Brandeis, 4 Harvard Law Review 193; 77 C.J.S. Right of Privacy §2 and cases there cited; 138 A.L.R. 49 and cases there cited.

But the article in The Sunday Bulletin was in the nature of a story and not a news article. It was in a

Sunday supplement and not in the news section; it was not written in the style of a news article; it was bedecked with an "illustrated" drawing covering over half of the page; although the basic facts of the article were admittedly true, the author embellished and fictionized them; the title of the article was written across the illustration and was entitled "Marriage for Spite."

The article loses much of its impact without the illustration, which was a drawing of a girl standing in front of a theatre her arms around a man who had a hat on the back of his head, a drooping cigarette in his mouth, a hand and a newspaper in his jacket pocket and his eyes to the ground away from the girl. The figures pictured bore no resemblance to Theresa and John whom they illustrated. Appearing under the illustration was "Since John was Barred From Her Home, Theresa Met Him Secretly on a Street Corner."

Only by reading the article can one appreciate how the author permitted his imagination to roam through the facts, and how newsworthy events were presented in a style used almost exclusively by writers of fiction. We, therefore, print it in full.[2]

---

[2] "IT WAS A CRUEL AND BITTER EXPERIENCE FOR THE YOUNG BRIDE, BUT SHE WAS NOT THE TYPE TO BE EASILY CRUSHED.

"BY . . . . .

"Midsummer heat slowed the steps of most of those in the early evening crowd at 11th and Market Streets in midtown Philadelphia. Movie goers sauntered toward bright marquees. Strollers window-shopped leisurely. Only two persons, a girl of 20 and a young man of 22, impelled as if by a jointly felt urgency, walked rapidly, unmindful of the temperature and the throng.

"It was Friday, Aug. 19, last year. The girl was Theresa Aquino and the youth was John N. Masciocchi. They were eloping.

"Besides that, they were moving into the first phase of an odd emotional conflict which did not reach its climax until this fall.

"Theresa and John grew up on South Philadelphia's congested Jackson Street, living only a block apart, but they never happened

As stated earlier, the article was written around a newsworthy event which ordinarily would fall within

---

to meet until two years ago, when friends introduced them. Theresa was a high school graduate, then employed as a clerk by a well known Philadelphia firm. John's means of support never were clear to her, although he said he worked.

"Almost at once she did not care what he did for a living. She fell in love with him. But her parents cared.

"Mr. and Mrs. Michael Aquino, thinking of Theresa's future, holding high hope for the daughter they loved, distrusted John.

"They told Theresa that he impressed them as being ill-mannered, irresponsible, and uneducated.

" 'For your own good and for our name,' her father said, 'don't bring him here.'

"Theresa didn't.

" 'I'll meet you outside the drugstore,' she sometimes told John. Sometimes he said to her, 'I'll be waiting for you at the movie.'

"These were clandestine meetings. The girl's parents did not know of them. But they were innocent meetings; there were no long absences; no out-of-town trips.

"Theresa was happy. Whether John was or not, she does not know now. The fact remained that he was barred from her home by her parents and disliked by them.

"When, in July, 1949, he urged her to elope with him, saying that they would live apart until he had money to rent a furnished apartment and later would be married in church, she agreed.

"It was a peculiar proposal, she realized, but she loved him.

"They therefore on the hot August night of the elopement hurried along Market Street, met another young couple who were to be witnesses and boarded a subway-elevated train. At Millbourne, a suburb, they alighted. They had their marriage license and reports of blood tests. 'Squire' Dawson M. Yerkes, a justice of the peace, performed the ceremony.

"Afterward there was a wedding supper consisting of snacks at a near-by drugstore and they took the inbound subway-elevated back to the city.

"John saw Theresa to a corner near her home and left her.

"The next day, John's sister, thinking that Theresa's parents should be informed of the marriage, went to their home and told them. John was summoned and the newlyweds faced the bride's parents.

the scope of proper immunity pertaining to the publication of current news. Can an article using a privi-

"The bride's mother suggested that they begin to live together at once. The bridegroom promised to arrange for a church wedding and get an apartment as soon as he could afford it.

"If any hostile looks flashed between John and his new parents-in-law they were not mentioned. He left the house without his bride.

"On Monday, Aug. 22, less than 72 hours after the wedding, John and Theresa met again. John told her then why he had hurried her into a marriage in name only.

"He had done it, she later quoted him as saying to spite her parents, because they had opposed him; he never intended to live with her, or to accept her as his wife.

"At first Theresa could not believe this. After that she was heart-broken.

"Later she telephoned and John would not answer. She wrote and he did not reply.

"Her parents employed an attorney, Filindo B. Masino, for her. An action for annulment of the marriage was begun. John did not defend it, but the suit was dismissed with the conclusion that the relief demanded should be sought through a divorce action.

"Theresa then sued for divorce. Again John failed to defend himself. President Judge FRANK SMITH of Philadelphia's Common Pleas Court No. 5 granted the decree.

"In his opinion the judge laid bare the extraordinary aspects of what he termed the bridegroom's fraud.

" 'When the libellant (Theresa) sought out the respondent (John) and asked when they would be married in a church,' the judge declared, 'the respondent replied that he had never intended to marry here and had only done so to spite her parents who were trying to break them up.

" 'After the marriage, the respondent avoided her and made it patent that he never intended to provide a home for her or live with her. He never contributed to her support or maintenance.

" 'His actions immediately after the marriage show his wilful and malicious intent to deceive and defraud this young woman at the time of the ceremony.

" 'It was no more than a mock marriage and brought about by his fraud.'

"Theresa is young and wounds do heal. She has a new job. She is pretty and bright and not the kind of girl to be crushed by the first knock, however hard, that this world gives her."

leged newsworthy event as a basis, be so presented that it will constitute an unwarranted invasion of the right of privacy of a person involved in such event?

In other words, is the Bulletin article, read as a whole, together with the pictorial representation, such a sensational version of facts embellished with matter drawn from the author's imagination that it is beyond the scope of proper immunity pertaining to the publication of news? We cannot say as a matter of law that the article was an unwarranted invasion of the appellees' right of privacy, but neither can we say as a matter of law that it was not. It was for the jury to determine, under proper instruction from the court, whether the article was a report of past or current events of public interest or whether its purpose was not the reporting of news but to amuse and astonish the reading public. *Sutton v. Hearst Corporation,* 98 N.Y.S. 2d 233, 234, 235, 277 App. Div. 155 (1950). The facts in the *Sutton* case were similar to this case in that the article was fundamentally true and based on public records. The court there said: "It is for the triers of the facts to determine whether the article and its surrounding illustrations were limited to reporting fairly past or current events, whether it is educational or informative, or whether the primary purpose, as the complaint alleges, was to amuse and astonish the reading public, not for the legitimate purpose of disseminating news, but for 'purposes of trade'; . . .

"The learned Special Term held that the article read as a whole, together with the headings and the pictorial representations that accompany it, constitute a sensationalized version of facts embellished with matters drawn from the author's imagination, and may well be found by the triers of the facts to go far beyond the scope of proper immunity pertaining to the publication of current or past news."

We recognize that in *Jenkins v. Dell Publishing Co.,* supra, 251 F. 2d 447, 451 (1958) the Court of Appeals of this Circuit held under Pennsylvania law that "once the character of an item as news is established, it is neither feasible nor desirable for a court to make a distinction between news for information and news for entertainment in determining the extent to which publication is privileged." This case, however, dealt with the publication of a picture and not a story fictionized as here.

In the case before us we think it was for the jury to determine whether the intrusion went beyond the limits of decency and whether the defendant should have known that the plaintiffs would be justified in feeling seriously hurt by the article. 4 Restatement of the Law of Torts §867.

The trial judge did exceptionally well in steering this case through the sparsely chartered waters of the right of privacy. After carefully and properly defining the elements and limitations of the right of privacy, Judge WATERS submitted to the jury the question of whether or not the public had a legitimate concern in the news and the way it was published. He submitted to the jury the question of whether the story was unwarranted and whether it exceeded the bounds of decency.

He further stated ". . . a bare recital of the facts would be no unwarranted invasion of the right of privacy where the recital relates to matters of public interest. However, it is possible for a writer or an illustrator to so color or slant his work, even though it relates to a matter of common and public interest, as to picture the persons who are the subjects of his work in a derogatory or humiliating or embarrassing light. A bald recitation of facts already known or readily available to the public gives no right of action. Lia-

bility in this, I have told you before and repeat in connection with this point for charge, exists only if the published account or the illustration accompanying it is such that the publisher should realize that it would be offensive to persons of ordinary sensibility, that it goes beyond, in other words, the limits of decency."

The jury having found for the plaintiff, under proper instructions from the Court, we are required to read the record in the light most favorable to the verdict winner, *Brown v. Shirk's Motor Express,* 393 Pa. 367, 143 A. 2d 374 (1958) and should enter judgment n.o.v. only if reasonable minds cannot differ as to validity of the defendant's position. *Jordan v. Kennedy,* 180 Pa. Superior Ct. 593, 596, 119 A. 2d 679 (1956); *Reidinger v. Lewis Jones Inc.,* 353 Pa. 298, 45 A. 2d 3 (1946).

We realize that it is extremely difficult to develop a precise and comprehensive rule which can be applied to a case where liability is based upon the manner in which an event is presented, and not upon publication of the event itself. The publication of a newsworthy event should always be privileged, unless its presentation is such that the intrusion upon the lives of the parties named in it *clearly* goes beyond the limits of decency. That these limits cannot be precisely defined, however, is no justification for reversing the jury's findings in a case like this one.

The evidence establishes that the plaintiffs' annoyance came almost entirely from the revelation of the fact, not theretofore known to their friends and relatives, that Theresa had been married and divorced. *Revealing* these newsworthy events was of itself not an unwarranted invasion of the right of privacy, and thus the mental disturbance coming from the *revelation* of the newsworthy events could not be a legal basis for damages in this case. Furthermore, the illustration,

which seems to be the most offensive part of the publication, was not an illustration of either of the appellants. The action is a personal action and the defendant is not liable to the appellees for what it related about Theresa, but only for what it related about them. The appellant suggested in its brief that the amount of the verdict was excessive, but as its counsel announced during the argument that he was not pressing for a reduction of the verdict, we have not considered this point.

There is no merit in the appellant's motion for a new trial.

Judgment affirmed.