Melvin **VARNISH**, Plaintiff-Appellee,

v.

**BEST MEDIUM PUBLISHING CO. Inc.,**
Defendant-Appellant.

No. 107, Docket 32359.

United States Court of Appeals
Second Circuit.

Argued Oct. 4, 1968.

Decided Dec. 31, 1968.

Certiorari Denied April 21, 1969.
See 89 S.Ct. 1465.

Ernest Allen Cohen (Jaffe Cohen Berman & Crystal, New York City, on the brief), for plaintiff-appellee.

Irwin M. Taylor (Kaufman, Taylor, Kimmel & Miller, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

This appeal presents the difficult question of whether the appellant's article, " 'Happiest Mother' Kills Her Three Children and Herself," was sufficiently untruthful and offensive to support a judgment for invasion of privacy.

In September, 1963, Melvin Varnish's wife killed their three infant children and committed suicide. In March, 1964, Best Medium Publishing Co., Inc. published an article in its weekly, *The Na-*

*tional Enquirer,* purporting to describe Varnish's actions and reactions in connection with this tragedy.[1] The article was based upon previous newspaper reports and police records which the author, James Donahue, had collected. On the basis of this article, plaintiff commenced this diversity action in the Southern District for invasion of privacy, claiming that the portrayal of his wife and his relationship with her was a complete fic-

tionalization, invented by the defendant to give the story an ironic and sensational twist, and that the publication was offensive to community standards of decency. He alleged that the article caused him severe mental distress, loss of job opportunities and loss of friends.

■ The case was tried before a jury, which, after an instruction to which appellant made no objection, awarded plaintiff $5,000 conpensatory [2] and $15,-

---

1. The article read as follows:

> Mrs. Joanne Varnish was known as the happiest woman in the neighborhood.
>
> She was young, pretty, had a good husband and three lovely children.
>
> She was bright, cheerful and completely devoted to her family. Things always ran smoothly in the Varnish household.
>
> So smoothly that more than one neighbor in their Concord, Calif., community said:
>
> "Now there's a model family. They're always so happy and contented and she's the happiest mother in the neighborhood."
>
> Each week Mrs. Varnish, 25, looked forward to going bowling with her husband, Melvin, 30, a successful auto salesman. They had been having fun doing it for years.
>
> Then last November 27, their regular weekly bowling night, she told her husband that she didn't feel like going bowling, that she'd rather stay home for a quiet evening.
>
> Then she said to him: "But you go along, dear, and have a good time.
>
> "And don't worry about us, we'll all be fast asleep when you get home."
>
> Varnish kissed her and left.
>
> At 1 a. m. he returned home—and found the house empty.
>
> He was racing through the house when he heard music coming from the garage.
>
> He dashed to the garage. The music was coming from the car radio. He also found his wife and three children —Debra, 5, Mitchell, 4, and Danny, 20 months.
>
> Mrs. Varnish had been right.
>
> She and the children were all fast asleep—forever.
>
> Mrs. Varnish had attached a vacuum cleaner hose to the exhaust on the family car and then sat the children in the car.
>
> She put the other end of the hose through a partially open window and then got in the car to wait for the fumes to put them all to sleep.
>
> Danny was in the front seat with his mother.
>
> Cuddled together in the back seat were Debra and Mitchell.
>
> Varnish's anguished screams when he came upon the tragedy awakened the neighbors, and called the fire department.
>
> Firemen worked vainly to revive them and then rushed them to a hospital.
>
> While doctors continued desperate efforts to revive the mother and children, police found a note left by Mrs. Varnish for her mother. It said:
>
> "Just a note in explanation to let you know I am going to put the three children and myself to sleep forever. I can't go on."
>
> It was an explanation that explained nothing, least of all to the shocked Varnish.
>
> He said: "I can't understand it. We had no troubles, no troubles at all. We were happy."
>
> Three hours after the discovery of the tragedy, doctors finally gave up and pronounced the mother and children dead.
>
> Varnish broke into tears, went from child to child, kissed each on the head and sobbed:
>
> "We'll have to forgive her. We'll have to forgive her."
>
> But it would be easier for Varnish if he could only understand why the happiest wife and mother in the neighborhood suddenly decided to kill her three children and herself.

2. Plaintiff at trial introduced evidence that as a result of the article he attempted suicide, suffered the need for psychiatric attention, suffered unemployment, was shunned in his community, and became the victim of severe mental suffering. Thus, there was ample evidence to sup-

000 punitive damages. On appeal, appellant contends that there is insufficient evidence to support a finding of invasion of privacy under Pennsylvania and federal law,[3] and that therefore its motion for a directed verdict or its motion for judgment notwithstanding the verdict should have been granted. As we find appellant's contentions to be without merit, we affirm the judgment.

■■■ Although Pennsylvania permits a tort action to redress unwarranted invasions of privacy, Aquino v. Bulletin Co., 190 Pa.Super. 528, 154 A.2d 422 (1959), it recognizes that privacy actions must be carefully scrutinized in order to avoid interference with First Amendment guarantees of freedom of speech and press. Aquino v. Bulletin Co., supra, 154 A.2d at 425; Jenkins v. Dell Publishing Co., 251 F.2d 447 (3d Cir. 1958), cert. den. 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365. Likewise, in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed. 2d 456 (1967), the United States Supreme Court held that First Amendment guarantees of speech and press forbid recovery, absent a showing of "knowledge of its falsity or in reckless disregard of the truth," in privacy actions involving "matters of public interest." While the scope of "matters of public interest" has not been clearly defined, it cannot be doubted that the subject of the Enquirer article, a murder-suicide, is within that category. Cf. Time, Inc. v. Hill, supra, 385 U.S. at 388, 87 S.Ct. 534; Jenkins v. Dell Publishing Co., supra, 251 F.2d at 450–452; Restatement (2d) Torts § 652 F (Tent.Draft No. 13, 1967). Thus it was incumbent upon the plaintiff to establish that the article was false and that it was published with knowledge that it was false or in reckless disregard for the

truth. After a review of the entire record, we conclude that there was ample evidence for the jury to find, as it did, that the plaintiff has met this burden.

Appellant claims that there was no evidence that its article was false in any material respect. However, plaintiff contended at trial, as he does here, that the story cast him in a false and unfavorable light, that the "happy wife and mother" theme used throughout the article was fictitious and was intended to be ironic, to indicate plaintiff's insensitivity and lack of caring and understanding for his wife. The record shows that Mrs. Varnish, far from being the happiest mother, was in reality a despondent, depressed and extremely unhappy woman. The suicide note, which itself expressed her extreme unhappiness and which was in the author's possession, was quoted in the article in a somewhat distorted manner:

"* * * police found a note left by Mrs. Varnish for her mother. It said:

'Just a note in explanation to let you know I am going to put the three children and myself to sleep forever. I can't go on.'

It was an explanation that explained nothing, least of all to the shocked Varnish."

The actual note in fact explained the suicide more fully:[4]

"Just a note and explanation to let you know that I am going to put the three children and myself to sleep forever. I can't go on any longer. I see no future for the children or myself. Mitch [plaintiff] is impossible and this is the only way to get away from him. I've had a miserable life since the time I met him. Tell Uncle Chris

port the jury's finding of compensatory damages. Cf. Diapulse Corp. v. Birtcher Corp., 362 F.2d 736 (2d Cir. 1966), cert. den., 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48.

3. Since plaintiff was a resident of Pennsylvania at the time of the publication, the parties agreed that Pennsylvania law should apply. To the extent that freedom

of the press is involved federal law is of course also relevant.

4. Although appellant argues that only part of the letter was quoted because Donahue wanted to write a "nice story," it is apparent that had the entire note been printed, the "happiest mother" approach, the selling point, would have been impossible.

and Uncle Butch I'm sorry about the money they each loaned me in 1961. \* \* \* I owe so much I'll never have to bother anyone anymore."

The article also stated that "more than one neighbor" had said that Mrs. Varnish was the "happiest mother in the neighborhood," whereas the two neighbors' statements which were available to the author merely stated that the Varnishes "seemed to get along fairly well." The story also contained fictionalized dialogue and some minor inaccuracies. It concluded:

"\* \* \* it would be easier for Varnish if he could only understand why the happiest wife and mother in the neighborhood suddenly decided to kill her three children and herself."

Plaintiff at trial testified that his wife was not a happy person; he repeatedly testified, however, that he understood her and her problems, that they had a difficult life and that he did what he could for her.

■■ We agree with the appellant that minor inaccuracies and fictionalized dialogue will not alone defeat the privilege granted to truthful publications of public interest. Cf. Spahn v. Julian Messner, Inc., 18 N.Y.2d 324, 274 N.Y.S. 2d 877, 221 N.E.2d 543 (1966), vacated and remanded, 387 U.S. 239, 87 S.Ct. 1706, 18 L.Ed.2d 744, rearg., 21 N.Y. 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967), probable jurisdiction noted, 393 U.S. 818, 89 S.Ct. 80, 21 L.Ed.2d 91 (Oct. 14, 1968); Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, 484, 68 N.Y.S.2d 779, 783–784, aff'd 272 App. Div. 759, 69 N.Y.S.2d 432 (1947). The district court here, however, specifically instructed the jury to ignore minor inaccuracies and required them to find "substantial" falsity. In light of the evidence outlined above and the unobjectionable instructions, we believe that the jury was entitled to accept plaintiff's view that the article as a whole presented a substantially false and distorted picture of him and his relationship with his wife.

■ We are also satisfied that the jury was properly instructed on the issue of knowledge and recklessness. It was told that innocent or negligent misstatement would not suffice, that recklessness requires "that the writer must be aware of a high probability that the statement might be false, and knowing that, \* \* \* takes a calculated risk and publishes it anyway." Compare St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (must show "that the defendant in fact entertained serious doubts as to the truth of his publication."); Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("high degree of awareness of their probable falsity").

■ Evidence of recklessness consists largely of the author's testimony on cross-examination that he had no basis, except his own "presumption," for labelling Mrs. Varnish a happy wife and mother. Both the suicide note and the police reports, which the author had in his possession, indicated that the Varnishes did not have a happy home life. Likewise, the manner in which the suicide note was used by the author could be taken as evidence of intent or recklessness. Therefore the jury was entitled to find that the article was published with knowledge that it was false, or in reckless disregard for the truth.[5]

■ Appellant also argues that there was no showing that the article was offensive to persons of ordinary sensibilities, as required by Pennsylvania law. Pennsylvania has held, however, in a case quite similar to this one, that this issue is peculiarly within the competence of the jury. Aquino v. Bulletin Co., supra, 154 A.2d at 430. We cannot say as a matter of law that the Enquirer article would not be offensive to a person of ordinary sensibilities.

5. This evidence also supports the jury's award of punitive damages.

Were we to hold, as the appellant urges, that on this record the plaintiff was not entitled to recovery, there would be insufficient restraint on reckless, irresponsible, and untruthful journalism under the guise of freedom of the press. We think that the standards applied by the district court, which required intentional or reckless falsity and offensiveness to persons of ordinary sensibilities, represent a proper balancing of the public interest in 'freedom of expression and the individual interest in privacy.

The judgment is affirmed.

HAYS, Circuit Judge (dissenting):

I would reverse the judgment of the district court. I cannot agree with the majority's conclusion that the Enquirer article is materially false.

Plaintiff's entire argument rests, as the majority indicates, on the theory that the story portrayed him in a false and unsympathetic light by implying that he was lacking in sensitivity and understanding. He objects particularly to the statement in the article that he did not understand why his wife had killed herself. But plaintiff testified that he did not understand why his wife had killed herself and that he could not swear that he had not told the investigating police about his inability to understand.

If the omitted part of the suicide message had been included, the story would have been more accurate but it would not have reflected plaintiff in any better light.

The irony of the description of the wife as happy cannot properly be held to justify withdrawal of constitutional protection.

Even if it be assumed that the article contains some false statements and that they were published knowingly or recklessly, there is nothing in the statements as to the plaintiff which is so offensive as to justify the verdict. That the article is in bad taste is not sufficient. It clearly does not go "beyond the limits of decency," as it must if plaintiff is to recover.

See Aquino v. Bulletin Co., 190 Pa.Super. 528, 154 A.2d 422 (1959).

The news media must be allowed wide leeway in deciding what they will report and how they will report it. See St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).