Hull et al., Appellants, *v.* The Curtis Publishing Company.

Argued March 20, 1956. Before HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (RHODES, P. J., absent).

*Morris J. Winokur,* for appellants.

*Wilbur H. Haines, Jr.,* with him *Philip H. Strubing* and *Pepper, Bodine, Frick, Scheetz & Hamilton,* for appellee.

OPINION BY WOODSIDE, J., October 3, 1956:

This is an appeal from the order and judgment of the lower court granting the defendant's motion for judgment non obstante veredicto after the jury found for the plaintiffs in an action in trespass for invasion of the right of privacy. The lower court held that the action was barred by the statute of limitations.

The three plaintiffs are Philadelphia policemen who claim the defendant invaded their right of privacy by publishing a photograph of them in the issue of The Saturday Evening Post dated January 31, 1948.

The photograph about which plaintiffs complain had previously been published in a daily newspaper. The circumstances leading to its ultimate publication in the "Post" were as follows:

In November of 1945 a robbery suspect was caught by two of the plaintiff police officers after a chase and brought into the police station. There a newspaper photographer took a series of three pictures which were published the following day in the Philadelphia Inquirer. The first of these pictures shows the suspect standing between two of the plaintiffs who are holding him by the wrists. The third plaintiff is looking over the suspect's shoulder toward the camera. The second photograph shows the suspect lunging forward with his head toward the floor only about two feet from it. All three of the uniformed plaintiffs are grabbing at him. Two of the plaintiffs testified that the suspect did not want his picture taken, but that they thought when he lunged forward that he was trying to break

away from them. The third picture shows a person in civilian clothes identified by the plaintiffs as a detective, firmly holding up the suspect's head by the chin while two of the plaintiffs hold his arms. The third plaintiff is standing back of the suspect looking on. The pictures were published with the caption: "James P. Sweeney, discharged vet suspected in holdup, fights police at 65th St. and Woodland Ave. station after chase and arrest." An article describing the holdup and how two of the plaintiffs chased and captured the suspect accompanied the pictures in the newspaper.

The second of these pictures appeared in an article published by The Saturday Evening Post nearly three years later. The article was entitled "Crime Was My Business" and was an account of the experiences of a former California police chief. It did not explain or have anything to do with the photograph. The caption under the photograph was "One of the compensations in a policeman's life is the thrill he gets out of walking into a potentially dangerous situation and knowing that it is his presence there that brings order. 'If I had to do it all over again,' says Mr. Powers, 'I'd still be a cop.' "

The defendant purchased the picture from the Acme News Agency in New York. With it the agency sent an explanation of the circumstances surrounding the taking of the photograph and the names of the plaintiffs. The photograph was selected by members of the defendant's staff from 76 different pictures obtained from several news agencies. The particular photograph was chosen because defendant felt that it most effectively illustrated the article with which it was published.

None of the plaintiffs gave permission or consent to its publication. The defendant made no attempt to obtain permission from any of the plaintiffs although

it could have easily located them had it made an effort to do so.

The plaintiffs testified that the picture published in the Post was called to their attention by people who remarked that it portrayed them as bullies beating a helpless prisoner. They testified that on the pavement in front of the home of one of them there appeared a drawing showing an officer beating a person with a club, and that for a matter of several months after the publication they all received anonymous phone calls and mail characterizing them as bullies.

The right of privacy has not been clearly defined.

It has been variously referred to as "the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short, . . . the right to be let alone." *Kerby v. Hal Roach Studios, Inc.,* 53 Cal. App. 2d 207, 127 P. 2d 577, 579 (1942) ; and as "the right of a person to be free from unwarranted publicity or unwarranted approbation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion of one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Smith v. Doss,* 251 Ala. 250, 37 So. 2d 118, 120, 121 (1948).

The right of privacy does not ordinarily apply to "public figures", *Sidis v. F-R Publishing Corporation,* 113 F. 2d 806 (1940) ; *Garner v. Triangle Publications, Inc.,* 97 F. Supp. 546, 549 (1951). "Generally, the right does not exist with respect to the dissemination of news and news events or educational information . . ." 77 C.J.S. Right of Privacy, §2, p. 399.

The right of privacy is a recent development arising from the use, and abuse, of the relatively recent in-

ventions of photography, radio, television and the growth of so-called "yellow journalism".[1]

The concept of a legal action for the invasion of the right of privacy was lying dormant in the legal minds of this country until Justice LOUIS D. BRANDEIS, while in his youth, collaborated with Professor Samuel D. Warren in writing an article published in the Harvard Law Review of December 15, 1890, Vol. 4, p. 193. So cogent was the logic of this article that it not only convinced legal minds of the advisability of having such an action, but also moved numerous courts to acknowledge the right and declare its existence. Whether such declaration was "judicial legislation", or whether it was based upon precedents founded upon related ancient principles is debatable.[2]

---

[1] For an interesting commentary on the problems arising from so-called "yellow journalism" see the approval message of Governor Samuel P. Pennypacker to the Act of May 12, 1903, P. L. 349, found at page 351 et seq. This act authorizing civil actions for the recovery of damages arising from newspaper publications negligently made, was repealed by the Act of May 1, 1907, P. L. 124.

[2] Brandeis and Warren, sensing that what they were advocating in their law review article could be classified as judicial legislation, wrote in a footnote as follows: "The application of an existing principle to a new state of facts is not judicial legislation. To call it such is to assert that the existing body of law consists practically of the statutes and decides cases, and to deny that the principles (of which these cases are ordinarily said to be evidence) exist at all. It is not the application of an existing principle to new cases, but the introduction of a new principle, which is properly termed judicial legislation.

"But even the fact that a certain decision would involve judicial legislation should not be taken as conclusive against the propriety of making it. This power has been constantly exercised by our judges, when applying to a new subject principles of private justice, moral fitness, and public convenience. Indeed, the elasticity of our law, its adaptability to new conditions, the capacity for growth, which has enabled it to meet the wants of an ever

Most courts which considered the subject apparently felt required to accept the legal principle without the necessity of action by the legislature.

changing society and to apply immediate relief for every recognized wrong, have been its greatest boast."

In a similar vein there can be found in *Peay v. Curtis Publishing Co.*, 78 F. Supp. 305 (1948), the following: " 'We should not be deterred by fear of being accused of judicial legislation. Much of our law is judge-made, and there are those who think that it is the best law. Cardozo, 'The Growth of the Law', p. 133. The common law's capacity to discover and apply remedies for acknowledged wrongs without waiting on legislation is one of its cardinal virtues.' "

It is true that "judge-made law" in some respects does establish better rules than statutes. The rules are generally more practical because they are developed through passing upon actual occurrences. They are more flexible because they are not so tightly tied to language fixed without any thought of some particular situation to which they may have to be applied. They are more equitable (1) because each proposed principle or rule is carefully researched and thoroughly considered by a number of trained people—judges and lawyers—to a greater extent than is customary, and indeed possible, in a legislative hall; (2) because they are not subject to the same extraneous political considerations and influences which frequently affect and control legislative actions; and (3) because they develop gradually by application of what seems just to actual occurrences.

How "stretching ancient principles to take on new meanings" was used in England by Henry II is brilliantly told by Sir Winston Churchill in Chapter 13 of "A History of the English Speaking Peoples".

Regardless of the faith which judges sometimes express in the value of "judge-made law", they must zealously guard against extending their authority beyond the limits intended by the Constitution.

Our democracy is a delicately balanced mechanism which should be tampered with sparingly. It is inherently dangerous for any branch of the government to infringe upon the prerogatives of any other branch. As the courts are less easily and less frequently restrained by the executive and legislative branches than these branches are restrained by the judiciary, the courts must exercise self discipline to avoid yielding to the temptation, so frequently

However, the first court to pass upon the question, the New York Court of Appeals, by a vote of four to three rejected the concept of privacy as a legal right. *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902). The legislature of that state later passed an act creating the right.

Georgia, through it highest court, recognized the right in 1904 and since then a number of other states have done likewise. For a list of courts which recognized the right, see *Peay v. Curtis Publishing Co.*, 78 F. Supp. 305, 307, 308 (1948) and "Interstate Publication", by Prof. William L. Prosser, 51 Mich. Law Review, 959, 988, 989 (1953).

---

found in officialdom, to extend authority beyond the boundaries set up by the Constitution, even when such extension may be for the accomplishment of a just and proper cause.

"Judicial legislation" is often undesirable from another standpoint. In practical effect, although not technically, it frequently operates as an ex post facto law. When the courts for the first time declare a certain act to be a crime or a tort, people find themselves being punished for acts previously done with immunity, and for which lawyers were unable to find prohibitive statutes or court decisions. When the legislature creates by statute a new crime or tort the public has an opportunity to know about it and to act within its provisions at the time it becomes effective. Furthermore, judicial legislation frequently involves a long period of development during which time there is much uncertainty and frequently much unwarranted litigation brought first to establish the principle and later to extend it.

Judges must negotiate a knife edge to avoid trespassing upon the prerogatives of the legislature while at the same time keeping the law vital and dynamic through the application of accepted principles to new situations.

Although it is quite possible that the courts of many states can be justly accused of "legislating" when they recognized the invasion of the right of privacy as a tort, nevertheless, as we point out in the body of the opinion, since the legislature of Pennsylvania has recognized the existence of the right, our application of the principle would not be subject to the same criticism.

The legal right of privacy is recognized in the Restatement of the Law of Torts, §867 in the following words: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other."

There are no appellate court decisions in Pennsylvania recognizing the existence of the right of privacy.[3]

First reference to it in the appellate courts of this state was in a concurring opinion by Justice, later Chief Justice, MAXEY in *Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433, 456, 194 A. 631 (1937). The principle was subsequently recognized in three cases in the Common Pleas Courts of Philadelphia County. In *Harlow v. Buno Co., Inc.*, 36 D. & C. 101 (1939) the right of such action was recognized, but recovery denied under the facts, because the invasion was not intentional and was discontinued as soon as the defendant learned its supposed authority to publish the plaintiff's picture was not genuine. In *Clayman v. Bernstein*, 38 D. & C. 543 (1940) the right was again recognized in an action to enjoin the use of a photograph taken by a doctor of a patient without her consent. In *Lisowski v. Jaskiewicz*, 76 D. & C. 79 (1951) the right was again recognized but preliminary objections were sustained on the ground that the complaint failed to show a violation of the right of privacy.

In *Schnabel v. Meredith*, 378 Pa. 609, 107 A. 2d 860 (1954), Justice JONES stated: "Assuming, without deciding, that (the right of privacy) does exist in Pennsylvania, the appellant has not brought himself within the operation of the rules governing the right

---

[3] "Note: On October 5, 1956, two days after this opinion was filed, the Supreme Court filed an opinion in the Appeal of David W. Mack, 386 Pa. 251, 126 A. 2d 679, in which that Court dealt with the right of privacy."

of privacy where such right has been judicially recognized."

Judge GOODRICH, of the Court of Appeals of the Third Circuit, held in *Leverton v. Curtis Publishing Co.*, 192 F. 2d 974 (1951), that the publication of a picture by a magazine was an actionable invasion of plaintiff's right of privacy under the laws of the Commonwealth of Pennsylvania. He recognized that "the outlines of the right and the privilege to invade it are still dimly marked" and that the court was required to "fashion our decision 'from the materials at hand' without the benefit of an authoritative decision on the exact point involved in Pennsylvania or elsewhere."

The Uniform Single Publication Act was adopted in Pennsylvania August 21, 1953, P. L. 1242, 12 PS §2090.1. It provides, inter alia, that "No person shall have more than one cause of action for damages for libel or slander, *or invasion of privacy,* or any other tort founded upon any single publication, or exhibition, or utterance, such as any one edition of a newspaper, or book, or magazine, or any one presentation to an audience, or any one broadcast over radio or television, or any one exhibition of a motion picture." (emphasis supplied)

The legislature did not *create* the right of privacy in Pennsylvania, but it did *recognize the existence* of such right in the above statute. Its existence was also recognized in the above cited cases by the Common Pleas Court of Philadelphia, and the United States Court of Appeals and it has not been rejected by our Supreme Court.

Thus assuming that an invasion of the right of privacy is a tort in Pennsylvania, is the statute of limitations two years or six years? Distribution of the issue of The Saturday Evening Post containing the photograph in question was completed August 7, 1948. This

action was brought March 21, 1952. The statute of limitations was properly pleaded by the defendant. If the statute of limitations is two years the action was brought too late; if it is six years it was brought in time.

The Act of March 27, 1713, I Sm. L. 76, §1, 12 PS §31, provides, inter alia, that, "actions upon the case, other than for slander, and the said actions for account, and the said actions for trespass, debt, detinue and replevin, for goods or cattle, and the said actions of trespass quare clausum fregit (shall be brought) within six years next after the cause of such action or suit, and not after."

The Act of June 24, 1895, P. L. 236, §2, 12 PS §34, provides: "Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards; in cases where the injury does result in death the limitation of action shall remain as now established by law."

The appellant properly observed that "It would probably be impossible to rely upon the distinctions between trespass vi et armis and trespass on the case for a determination of this problem because these distinctions have faded in our law to the extent that our procedural rules have completely abolished them."

Because recognition of the right is new, and its development recent, the courts have resorted to various theories to support it, calling upon different accepted principles to justify its recognition. It appears clear to us, however, that the invasion of privacy is an "injury wrongfully done to the person" and is therefore controlled by the Act of 1895.

As Roscoe Pound has written, in his article in 28 Harvard Law Review, 343 at pages 363-4 (1915); "A

man's feelings are as much a part of his personality as his limbs. The actions that protect the latter from injury may well be made to protect the former by the ordinary process of legal growth."

In *Harlow v. Buno Co., Inc.,* supra, the action is referred to as a "direct trespass" and in *Clayman v. Bernstein,* supra, the right is called "a personal right."

It has been said: "The gravamen of the action . . . is the injury to the feelings of the plaintiff, the mental anguish and distress caused by the publication . . . Unlike libel and slander, the gist of the cause is not injury to the character or reputation which appertains to the standing of a person in the eyes of others and are attributes in law separate from the 'person.' . . .

"Since, under the law, recovery may be had for an invasion of the right of privacy for injured feelings alone, the wrongs redressed must be considered as a direct rather than an indirect injury and one that is wholly personal in character, not depending on any effect which the publication may have on the standing of the individual in the community. It seems to us that the mind of an individual, his feelings and mental processes, are as much a part of his person as his observable physical members. An injury, therefore, which affects the sensibilities is equally an injury to the person as an injury to the body would be. In that respect a cause of action for the violation of the right of privacy, causing mental suffering to the plaintiff, is an injury to the person." *Bernstein v. National Broadcasting Company,* 129 F. Supp. 817, 825 (1955) ; *Wyatt v. Hall's Portrait Studio,* 71 Misc. 199, 128 N.Y.S. 247; *Reed v. Real Detective Publishing Co.,* 63 Ariz. 294, 295, 305, 306, 162 P. 2d 133, 138 (1945).

In *Ettore v. Philco Television Broadcasting Corp.,* 229 F. 2d 481 (1956), speaking of the *Leverton* case, Chief Judge BIGGS of the Third Circuit said: "In this

type of case, by and large, the right invaded is a very personal one, really 'the right to be let alone' described by Warren and Brandeis, and not a property right at all."

We think that the court below correctly held that the statute of limitations on an action for invasion of privacy is two years in Pennsylvania, and that for that reason judgment n.o.v. was properly entered.

In affirming the court below it should not be assumed that we are thereby placing our approval upon its conclusion that the publishing of the photograph of the plaintiffs by the defendant was an actionable invasion of their right of privacy.

The lower court and the appellant point to the similarity of the facts of this case to those in the case of *Leverton v. Curtis Publishing Co.*, supra.

There it was held that a child's right of privacy was wrongfully invaded by publishing in a magazine a photograph taken of her as she lay in the street immediately after she had been struck by an automobile, even though the photograph had been published in a newspaper at the time of the accident. The magazine article was entitled: "They Asked to be Killed", and related to the general subject of traffic accidents and pedestrian carelessness. The court noted that the picture was used in connection with several headings tending to say that the plaintiff narrowly escaped death because she was careless of her own safety, where as a matter of fact at the time of the accident the motorist who struck her, and not she, was careless. The court said: "The sum total of all this is that this particular plaintiff, the legitimate subject for publicity for one particular accident, now becomes a pictorial, frightful example of pedestrian carelessness."

Assuming that we are in accord with the holding

of the federal court in that case, there are two important distinctions between it and the instant case.

While in the *Leverton* case the photograph in question was used to demonstrate carelessness on the part of the person pictured, in the instant case the photograph was used to demonstrate that an officer's presence brings order.[4] One article is critical of the conduct of the person pictured, the other is complimentary.

It would seem that the right of privacy, distinct from defamation,[5] might include the right not to have one's picture published under circumstances which are complimentary as well as those which are critical, nevertheless, the right is generally recognized to exist only where the wrongful intrusion is "in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Smith v. Doss,* supra.

Furthermore, in the *Leverton* case the photograph depicted a person in a private capacity, while here it depicted officials performing a governmental duty.

There is some doubt whether an official or employe of the government has the right of personal privacy while performing a governmental function. The right of privacy does not ordinarily apply to public figures,

---

[4] In the instant case the article as a whole was favorable to the position of a policeman and generally praised his efforts although there was a reference to "the satisfaction of turning the tables on a wife slapper or a baby beater and clouting the hell out of him—only not before witnesses, of course."

[5] The right of privacy is not a branch of the law of defamation although it has sometimes been treated as such. Care must be taken not to confuse the two actions. In actions to recover damages for defamation truth is a defense; in action to recover damages for invasion of privacy it is not. Damages in actions of defamation are for an injury to reputation, while damages in action for invasion of privacy are for injury to one's own feelings.

*Sidis v. F-R Pub. Corporation* (supra). In the article by Brandeis and Warren, supra, they state that "The general object in view is to protect the privacy of private life, and to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn."

"A person who by . . . adopting a profession or calling which gives the public a legitimate interest in his doings . . . is said to become a public personage and thereby relinquishes a part of the right of privacy." *Cohen v. Marx*, 211 P. 2d 320, 321 (1949).

The picture in question was taken while the plaintiffs were performing an official governmental duty in apprehending a criminal and taking him to a place of detention. When there is no defamation, we have grave doubts whether a tort is committed by the publishing in a magazine article of a picture of governmental officials or employees engaged in the performance of an official duty, particularly of the type which is by the very nature of things likely to be performed in public, to wit, the apprehension of criminals and taking them to the place of detention.

Officials, even in the performance of public duties, are entitled to privacy, under certain circumstances. Eavesdropping upon a cabinet meeting discussion or an executive session of an appellate court would be an invasion of that privacy (as well as violations of other sort), but if there would be a right to such privacy it would be a right of official privacy which would be invaded, not personal privacy, and the individual officials would not be entitled to damages for such breach.

We do not say that there are not circumstances under which the right of privacy would be invaded by publishing an official act performed by an employee or

officer of the government, but the doing of an official act does not seem to be the type of thing which the right of privacy was meant to protect. But see *Continental Optical Co. v. Reed*, 19 Ind. App. 643, 86 N.E. 2d 306 (1949).

It seems to us that holding the photograph published by the defendant in this case to be an invasion of the plaintiff's right of privacy would be extending that right beyond the limits to which it has previously been applied and beyond which it was intended to apply. Brandeis and Warren suggested: ". . . it is only the more flagrant breaches of decency and propriety that could in practice be reached, and it is not perhaps desirable even to attempt to repress everything which the nicest taste and keenest sense of the respect due to private life would condemn."

Furthermore, it must not be forgotten that the right of privacy infringes upon freedom of speech and press and clashes with the interest of the public in the free dissemination of news and information, and that these paramount public interests must be considered when placing the necessary limitations upon the right of privacy. *Gill v. Curtis Publishing Co.*, 239 P. 2d 630 (Cal. 1952).

There is much to be written upon this phase of the case but since we are basing our conclusion upon the ground that the action here is barred by the statute of limitations, and are therefore not deciding whether the publication of the photograph is actionable, we deem it unnecessary to discuss the question in any further detail.

Order and judgment affirmed.