**Clare Randall UHL, Plaintiff,**

v.

**COLUMBIA BROADCASTING SYSTEMS, INC., Defendant.**

**Civ. A. No. 77–100 ERIE.**

United States District Court, W. D. Pennsylvania.

June 13, 1979.

On Motion for Judgment N.O.V. Sept. 27, 1979.

David P. Brandt, Franklin, Pa., for plaintiff.

Gilbert J. Helwig, Pittsburgh, Pa., and Carleton G. Eldridge Jr. and Pamela G. Ostrager, New York City, for defendant.

## MEMORANDUM OPINION

WEBER, Chief Judge.

The Defendant has filed a Motion for Summary Judgment which sets out two grounds: 1) that the Plaintiff's action is barred by the one year Statute of Limitations applicable to defamation actions in Pennsylvania; and 2) that the documentary film published by the Defendant does not show the Defendant in an actionable false light and is protected by the First Amendment.

This case involved a television documentary about hunting which the Defendant broadcast in September 1975. The Plaintiff claims that segments of the documentary constitute an actionable invasion of his privacy by showing him in a false light, namely as an unsportsmanlike hunter. At a hearing on the Defendant's Motion for Summary Judgment, the Court viewed the

allegedly tortious segment of the telecast which has been made part of the record in this case. In brief, the offending segment begins with a picture of geese walking in a cleared area of land next to a cornfield and proceeds to a picture of hunters lurking in a duck blind observing the geese. The next series of pictures shows the hunters rise in unison, point their firearms in an approximately horizontal direction and fire. The next picture shows geese in flight and is followed by a series of pictures of the Plaintiff walking from the cornfield into the cleared area where he picks up a goose which was lying on the ground. The whole episode is viewed for less than a minute and the accompanying script of dialogue and commentary is about 2½ pages. The Plaintiff argues that the whole segment creates the false impression that he shot a goose which was walking rather than flying, and that this impression disgraces the Plaintiff in the eyes of his fellow hunters and the public at large.

## I.

■ The Defendant's first contention is based upon the statute of limitations. The Defendant broadcast the documentary in September 1975, and the Plaintiff filed his action in June 1977. The Defendant argues that, despite the fact that the Plaintiff has brought his action as an invasion of privacy theory for placing him in a false light, his allegations "sound in defamation" and his complaint should be dismissed because it was filed more than one year after the telecast. The Defendant seems to imply that defamation and false light are mutually exclusive torts and that because the allegations "sound in defamation" the one year statute of limitations ought to apply. The torts of defamation and invasion of privacy, however, are separate and distinct in Pennsylvania law, compare *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971) with *Vogel v. W. T. Grant Co.*, 458 Pa. 124, 327 A.2d 133 (1974), and we cannot re-classify the Plaintiff's case and apply the defamation statute of limitations solely because it "sounds in defamation" when his factual allegations support his claim that the Defendant invaded his privacy by portraying him in a false light. Our viewing of the telecast indicates that his allegations were made in good faith.

■ Accordingly, the issue raised by the Defendant's Motion for Summary Judgment becomes whether actions for invasion of privacy are governed by the one year defamation statute of limitations or the two year personal injury statute of limitations. In 1974 the Pennsylvania Supreme Court accepted the formulation of the tort of invasion of privacy set out in Restatement (Second) of Torts § 652A, *Vogel v. W. T. Grant Co.*, supra 458 Pa. at 129. Since *Vogel*, Pennsylvania courts have only twice discussed the statute of limitations applicable in actions for invasion of privacy and on both occasions said that the statute of limitations is two years for invasion of privacy and one year for defamation, *Kennedy v. The Bulletin Co.*, 237 Pa.Super. 66, 70, 346 A.2d 343 (1975), allocatur refused; *Hoffman v. Hibbs*, 235 Pa.Super. 470, 344 A.2d 546, 547 (1975), allocatur refused. Both decisions rely on *Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 125 A.2d 644 (1956) which was decided before Pennsylvania adopted the formulation of the tort of invasion of privacy set out in the Restatement § 652A but during the time that Pennsylvania recognized an individual's legally protectable interest in not being falsely portrayed to the public, the essence of "false light" invasion of privacy.

In *Hull*, certain policemen brought an action in trespass for invasion of privacy against the publisher of the Saturday Evening Post for publishing a photograph of the plaintiffs holding a suspect after apprehending him. The plaintiffs alleged that the picture portrayed them to the public as bullies beating a defenseless prisoner. The photograph was not published as part of a news account of the robbery but rather accompanied a newspaper account of the experiences of a California police chief entitled "Crime Is My Business." The defendant explained that the photograph was selected from a collection of several because it

effectively illustrated the article with which it was published. The facts of *Hull* approximated those which give rise to the tort of "false light" invasion of privacy in the post-*Vogel* era.

The issue in *Hull* was whether the statute of limitations for actions alleging invasion of privacy was that of personal injury actions—2 years, or that of actions for trespass to goods of cattle—6 years. After discussing at length and with eloquence the similarities between injuries to one's person and those to one's reputation, the court held that "the statute of limitations on an action for invasion of privacy is two years . . .," 125 A.2d at 649.

The Defendant challenges the precedential value of *Hull* for the instant case on the grounds that the court in *Hull* did not consider whether the applicable statute of limitations for invasion of privacy should be less than two years, or in other words, whether a plaintiff should have twice as long to file action alleging invasion of privacy as he has to file an action alleging defamation. Any such weakness in the precedential value of *Hull* was remedied by *Hoffman v. Hibbs*, supra, in which the Superior Court had the opportunity to modify its holding in *Hull* by holding that the statutes of limitations for defamation and invasion of privacy should both be one year and by dismissing the Plaintiff's motion to amend his complaint to allege invasion of privacy. Instead, the court allowed the plaintiff, whose defamation claim was barred by the one year statute of limitations, to amend his complaint to allege invasion of privacy and to proceed on that count which was filed after one year but within two years of the actionable conduct. Based upon this series of cases, we must hold that the statute of limitations for cases alleging invasion of privacy is two years.

We apply this rule, however, without agreeing with it, accord, *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1227–28 (3d Cir. 1970). We cannot see why the statutes of limitations for defamation and invasion of privacy should differ when the interests they protect are so similar.

The purpose of statutes of limitations is to allow a plaintiff a reasonable time to realize the nature and extent of his injuries and file a lawsuit and, after that time passes, to bar actions and thereby relieve potential defendants of the anxiety of litigation. The appropriate length of statutes of limitations is governed by the kinds of injuries which particular causes of action protect and the speed at which they become apparent to the plaintiff. The injuries which may result from defamation and invasion of privacy are similar in nature and injuries resulting from defamation arise, as a general rule, no faster than those resulting from invasion of privacy. Publications which may give rise to liability under both torts travel through the same media at the same speed. That a particular act may give rise to a cause of action under both torts but that the two statutes of limitations may differ in such cases baffles the court as well as the layman and gives substance to Dickens' observation about the nature of the law. The recent act of the Pennsylvania legislature which established a one year statute of limitations for both defamation and invasion of privacy, Judicial Code of 1976, § 5523, P.L. 586, Act No. 142, June 27, 1978, solves this aberration, but too late for us in this case.

## II.

Because we have determined that the action which is not barred is an invasion of privacy action under Restatement § 652A, we cannot conclude that the second ground of the defendant's motion to dismiss is applicable to the valid invasion of privacy claim. While the defendant urges that the publication is subject to the initial determination by the Court that the publication is capable of a defamatory meaning, we cannot find any support for the argument that similar treatment must be accorded any allegation of invasion of privacy because of the distinction the Pennsylvania courts have drawn between the two causes of action. Therefore, we also deny the second ground of the defendant's motion to dismiss without prejudice to its reconsideration at the

time of trial. We have separately ordered pretrial briefs to be submitted on this point.

## OPINION

### ON MOTION FOR JUDGMENT N.O.V.

The season when ordinarily kind hearted business men fill up their pockets with cartridges,
And go prowling around the woods in search of caribous and partridges.

O. Nash

The matters raised in the present Motion for Judgment N.O.V. were all raised, argued and briefed at trial or before trial and the court considered or determined them. No new briefs or arguments have been considered here and the court is determining the present motion in accordance with the trial rulings for the reasons set forth in this opinion.

This was a diversity action for invasion of privacy under the rule of Sec. 652E of the Restatement of Torts (Second). It did not include a claim for defamation which, by a quirk of Pennsylvania procedural law then in effect, was time barred, as where any elements of damages solely derivative from a defamation cause of action.[1] The jury found for plaintiff and awarded nominal damages of one dollar. Defendant moves for Judgment N.O.V.

The action arose out of the CBS special TV broadcast called "The Guns of Autumn." This TV special ran on the nationwide network for 1½ hours of prime time. In format, development, dramatic arrangement, and commentary (like the chorus which supplies the continuity in the classic Greek drama) it was a splendid piece of "show biz", and evoked a storm of adverse comment throughout the country. Although plaintiff belatedly attempted to raise a second false light invasion of privacy claim by reason of the inclusion of his picture in the entire production, which generally portrayed bad hunting practices, he was limited at trial by his pleading to the specific segment which he had pleaded as

depicting him in a false light. Only the sequence of the film showing the hunting of wild geese at the Pymatuning Waterfowl area, of about 5 minutes duration, was shown to the jury.

The short segment giving rise to the cause of action was of about a minute's duration, showing some frames of wild geese walking in a cleared patch of ground at the edge of a cornfield, an immediate switch to frames showing close-up views of some hunters (including plaintiff) in a blind fashioned from cornstocks rising and shooting in a generally horizontal direction, then an immediate switch to the plaintiff walking in the cleared cornfield and picking of a dead goose. The plaintiff argued that the inference of the immediate juxtaposition of these scenes made him appear in the false light of a hunter who engaged in the very unsportsmanlike and unethical act of shooting a goose on the ground. The jury heard the testimony of the plaintiff and his companion that the spliced together segments of film did not accurately portray the events, that they did not shoot the geese walking in the clearing despite the urging of the CBS camera crew to do so, and that the downed goose was shot in the air as it approached the clearing. The jury viewed the replay of this film segment several times, even in stop-motion segments showing the scene a frame at a time. Their verdict shows that they believed that the portrayal was false, and therefore plaintiff has the benefit of all inferences from the evidence which support his claim.

The first point raised in Defendant's Motion for Judgment N.O.V. is that as a matter of law the film on which the claim is based is not capable of conveying the false light meaning which plaintiff ascribes to it; i. e. that it portrayed plaintiff as having shot a goose that was on the ground when he shot it. The issue of falsity was submitted to the jury. The court and jury saw three scenes in short and quick sequence, a long shot of geese walking on the ground, a close up of the plaintiff shooting, a long shot of plaintiff walking in the field and

1. See Opinion of June 13, 1979.

picking up a dead goose. The implication is clear. The falsity of the portrayal was shown by plaintiff's testimony that these were separate shots of separate incidents divided by time intervals, and the editing of the film to provide this sequence to fit within the time frame of the broadcast was evident not only for this incident, but for the whole segment dealing with the Pymatuning waterfowl propagation area where the film passed from the pre-dawn darkness, to sunrise, to mid-morning in a few minutes.

■ The defendant complains that even if this message was conveyed to the viewer it would not be highly offensive to a reasonable person, and that therefore the matter should not have been submitted to the jury. This essential element of the cause of action under Sec. 652E was given to the jury in the instructions. Regardless of what a cameraman from Brooklyn or a lawyer from New York might think, or even what a Pennsylvania trial judge who is not a hunter might think, it appears from the testimony at trial that in wide reaches of America west of the Hudson where the flights of wild geese darken the noonday sky this is a rather nasty thing to say about a hunter, even if you smile when saying it. This was so testified by witnesses and supported by documentary evidence. It is clearly a fact question for a jury to say what the reaction of a reasonable man might be. We must be as considerate of a party's constitutional right to a jury trial as we are of the claim of the media to freedom of publication.

We believe defendant's position arises from the law of defamation where a court must make the determination as a matter of law, whether language can reasonably be construed as defamatory. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971).

■ While in many instances there is an overlapping of the action for defamation and the action for invasion of privacy the scope of invasion of privacy cases goes beyond the narrow limits of defamation. Prosser, *Torts*, p. 813. The invasion of privacy need not be defamatory. *Bennett v. Norban*, 396 Pa. 94, 151 A.2d 476 (1959), Restatement *Torts* 2nd § 652E, Comment (b). While we have found differences between the tort of defamation and that of invasion of privacy which would not require the application of this rule to a claim of invasion of privacy, to the extent that it applies, the court has made this decision by submitting this question to the jury.

■ The most strongly pressed of defendant's arguments is the failure of plaintiff to present evidence to defeat defendant's constitutional privilege under the First Amendment.

We will accept the premise that the rule of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) applies to this case, under the extension of that rule to matters of public concern, which include news, information, education and entertainment. Prosser, op. cit. p. 824, *United Medical Labs v. CBS Inc.*, 404 F.2d 706 (9th Cir. 1968), and that invasion of privacy claims must also face the constitutional standard, *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). While this requires proof of malice in the sense of scienter, that defendant had knowledge of the falsity or acted in reckless disregard of the truth or falsity of the matters presented, defendant also argues that such evidence requires proof of the subjective state of mind of defendant's agents, a subjective test, by clear and convincing evidence, under the decision in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

We do not read *Herbert v. Lando* so broadly. The court had previously in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) stated that for plaintiffs who are public figures, "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention . . . and those who hold governmental office . ." (p. 342, 94 S.Ct. p. 3008) the rules applies, but as to private individuals the standard is that imposed by state law.

"Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*." *Gertz*, p. 348, 94 S.Ct. p. 3011.

The plaintiff here is a private individual who traveled a few miles from his home to go hunting for a day. He sought no public office, he interjected himself into no controversy, he did not seek to have his picture taken although he knew of the presence of a camera crew.

Anthony Herbert was a public figure who sought and received widespread media attention for his reports of conditions in Vietnam during the American military operation there. CBS Inc. produced a TV program on his actions and the editor of that program, Lando, also published a related article. Herbert sued for defamation in a United States District Court. To support his case and meet the *Sullivan* actual malice standard he sought discovery by deposition. When Lando and others resisted on the grounds that inquiry into the state of mind of those who edit, produce or publish is prohibited by the First Amendment guarantee of freedom of the press, the Court held that because Herbert had the burden of showing actual malice, and because the defendant's state of mind was of central importance to the issue, and because Fed.R. Civ.P. 26(b) permitted discovery of any matter relevant to the subject matter of the pending action, such discovery should be allowed. Courts generally have always admitted evidence relevant to a state of mind of a defendant, either to defeat a conditional privilege or enhance damages.

But, contrary to the position that associate defense counsel took at trial, *Herbert v. Lando*, does not require that a plaintiff indulge in a spate of depositions before trial.

In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), the Court upheld a finding of malice in an invasion of privacy case on a showing that the writer's account gave an impression of a face-to-face interview with the plaintiff, which had not occurred. The Court found these pseudo-factual recitals of matters occurring during the interview to be "calculated falsehoods" sufficient to support a finding of knowing or reckless untruth. In the present case the testimony of the plaintiff and his companion as to the sequence of the events in the blind, compared to the obviously edited film version clearly demonstrate that the film version was not true and that the employees who spliced the segments of film together did so to produce the effect of shock they were seeking. Plaintiff and his witness testified that the portrayal was not accurate, yet the resulting pictorial episode produced an illustration of unsportsmanlike behavior to illustrate defendant's message. This is similar to the situation in *Leverton v. Curtis Publishing Co.*, 192 F.2d 974 (3d Cir. 1957) where an accurate photograph of an innocent pedestrian victim was used to illustrate a story on careless pedestrians. This was an invasion of privacy case decided prior to the establishment of the *Sullivan* doctrine, but it illustrates the applicable doctrine with relation to plaintiffs who are private individuals. The Court in *Herbert v. Lando*, acknowledged this interpretation of *Gertz*. "Nor did the *Gertz* opinion, in requiring proof of some degree of fault on the part of the defendant editor and in forbidding punitive damages absent at least reckless disregard of truth or falsity, suggest that the First Amendment also foreclosed direct inquiry into these critical elements." (441 U.S. 168, 99 S.Ct. 1645).

While punitive or exemplary damages were claimed in this action, the court refused plaintiff's request for a charge on this claim, absent the evidence of a reckless disregard of truth or falsity. In so doing we were following the distinction between the definition of "actual malice" as established in *New York Times v. Sullivan*, and the common law standard of malice generally required to support an award of punitive damages. In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42

L.Ed.2d 419, the Court distinguished between them. *Sullivan's* malice is " 'with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not.' As so defined, of course, 'actual malice' is a term of art, created to provide a convenient shorthand expression for a standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers. [(f. n. 4). In *Time v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, the Court did not employ this term of art. Instead the Court repeated the actual standard of knowing or reckless falsehood at every relevant point. See, e. g. id at 388, 390, 394, 87 S.Ct. 534]. As such, it is quite different from the common-law standard of 'malice' generally required under state tort law to support an award of punitive damages. In a false-light case, common-law malice—frequently expressed either in terms of personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights—would focus on the defendant's attitude toward the plaintiff's privacy, not toward the truth or falsity of the material published. See *Time, Inc. v. Hill*, 385 U.S. at 396, n. 12, 87 S.Ct. 534. See generally W. Prosser, *Law of Torts* 9–10 (4th ed.)." pp. 251–252, 95 S.Ct. p. 470.

We were continually bombarded at trial by defendant's associate counsel with the argument that there must be a showing of actual malice. I rejected that term (unless it be spoken in quotation marks) for the same reason that Mr. Justice Stewart expressed in his dissent in *Herbert v. Lando* :

"Although I joined the Court's opinion in *New York Times*, I have come greatly to regret the use in that opinion of the phrase 'actual malice'. For the fact of the matter is that 'malice' as used in the *New York Times*' opinion simply does not mean malice as that word is commonly understood. In common understanding, malice means ill will or hostility, and the most relevant question in determining whether a person's action was motivated by actual malice is to ask

'why'. As part of the constitutional standard enunciated in the *New York Times* ' case, however, 'actual malice' has nothing to do with hostility or ill will, and the question 'why' is totally irrelevant." 441 U.S. 199, 99 S.Ct. 1661.

In charging the jury this court followed this distinction, submitting the question of truth or falsity, but denying the applicable charge on punitive damages.

In coming to a conclusion I must add a strongly felt personal observation to one line of argument raised at trial by defendant's associate counsel in support of a speaking motion. This court's interpretation of the argument was that plaintiff's case should be dismissed at the end of his evidence because he had not indulged himself in a wave of discovery depositions of defendant's personnel involved in the filming, production and editing of the film. It was argued that such discovery was essential to determine the subjective state of mind of defendant's employees. The court had fleeting visions of deponents surrounded by lawyers, with psychoanalysts at their elbows, and wired to polygraph machines while being so interrogated. The court curtly informed counsel that cases could be adequately prepared and tried without discovery depositions, and in fact were frequently so tried within the memory of some present members of the bench and bar. The implication of this argument to the court was that a poor man or even a man of some means has no business bringing litigation in court unless he can afford the services of a large double-breasted law firm with platoons of young credit card-carrying associates who can fan out all over the country on a search-and-depose mission. The plaintiff is a young workingman living in a small town. His attorney is a young sole practitioner engaged in general law practice in the county seat of a rural Pennsylvania county. To suggest that they cannot have their day in court without the orgy of discovery that now attends most lawsuits in Federal Court between well-heeled corporate litigants is indeed a bleak prospect for American justice. I note that

Mr. Justice Powell, concurring in *Herbert v. Lando,* 441 U.S. at 177, 99 S.Ct. 1650, took occasion to comment upon the widespread abuse of discovery that has become a prime cause of delay and expense in civil litigation. However, I must also take time to note the prompt, efficient, and mutually courteous manner in which trial counsel presented the evidence and argued the case before the jury here.